Township of Silver Spring, Appellant *v.* Jeffrey Thompson, Appellee.

Argued May 9, 1985, before Judges DOYLE and COLINS, and Senior Judge BARBIERI, sitting as a panel of three.

Richard C. Snelbaker, Snelbaker, McCaleb & Elicker, for appellant.

P. Richard Wagner, for appellee.

Opinion by Judge Doyle, July 18, 1985:

The Township of Silver Spring (Appellant) appeals from the Court of Common Pleas of Cumberland County's reversal of an order of the Township Board of Supervisors (Board) which had removed Officer Jeffrey Thompson from the Silver Spring Township Police Department for conduct unbecoming an officer.

The relevant facts may be summarized briefly. On December 21, 1982, a quantity of silver coins, which had been recovered by a township police officer in connection with a burglary, was placed in a filing cabinet in the Township Manager's office for safekeeping. On February 14, 1983, the coins were discovered to be missing. Subsequent to this discovery, the Chief of Police (Chief Toomey) questioned all six officers in the force, the Township Manager and the two secretaries who had access to the filing cabinet, about the disappearance. All of these people professed ignor-

ance of the matter, and all were subsequently required by Chief Toomey to submit to a polygraph examination to determine the veracity of their statements.[1] The polygraph examiner reported to Chief Toomey that his interpretation of the results indicated that only the Appellee had been deceptive in his responses to questions concerning theft of the coins.[2] Solely on the basis of this interpretation, charges of conduct unbecoming an officer were filed against the Appellee. At a hearing held before the Board on October 23, 1983, the polygraph results were admitted over the objection of counsel for the Appellee, and on January 11, 1984, Appellee was dismissed. The court of common pleas, in an exceptionally well-reasoned opinion, reversed the Board on two grounds, concluding first that the results of a polygraph examination were not admissible in an administrative proceeding, and secondly, that even if the results of this test had been properly admitted, standing alone they did not amount to the substantial evidence required to support the Board's findings. Appellee was reinstated with back pay.

---

[1] Chief Toomey took the test himself as well.

[2] The following questions were included in the test:

(a) Did you steal any part of that missing money?

(b) Did you help to steal any part of that missing money?

(c) Did you remove any part of that missing money from the Township Building?

(d) Did you help to remove any part of that missing money from the Township Building?

(e) Did you receive any part of that missing money after it was stolen from the Township Building?

(f) Do you suspect anyone in particular of stealing any part of that missing money?

(g) Do you know for sure who stole any part of that missing money?

Since this matter was decided on the basis of proceedings before the Township Board of Supervisors, our review is limited to the record and order of the Board. We are, as was the trial court, constrained to affirm the Board's adjudication unless we find that it is in violation of the constitutional rights of the Appellee or not in accordance with law, or that any essential finding of fact made by the Board is not supported by substantial evidence. Section 754(b) of the Local Agency Law, 2 Pa. C. S. §754(b).

The question of law with which we are squarely confronted in this appeal is whether or not the results of a polygraph examination are admissible as evidence in a local agency proceeding which is brought for the purpose of dismissing a police officer under the Police Tenure Act,[3] 53 P.S. §§811-816. In order to answer this question, we must first assess the effects of two superficially unrelated statutory provisions.

Section 554 of the Local Agency Law, 2 Pa. C. S. §554, provides that "[l]ocal agencies shall not be bound by technical rules of evidence at agency hearings, and all relevant evidence of reasonably probative value may be received." Keeping in mind that Appellee was not charged with theft, but rather with giving deceptive responses to inquires concerning the disappearance of evidence in connection with a police investigation, we believe there is no question that the test results would be quite probative of these charges *if they were accurate.* In regard to the consideration of accuracy, Appellant refers us to Section 7321(a) of the Crimes Code, 18 Pa. C. S. §7321(a), which provides as follows:

(a) *Offense defined.*—A person is guilty of a misdemeanor of the second degree if he requires as a condition for employment or con-

---

[3] Act of June 15, 1951, P.L. 586, *as amended.*

tinuation of employment that an employee or other individual shall take a polygraph test or any form of a mechanical or electrical lie detector test.

(b) *Exception.*—The provisions of subsection (a) of this section shall not apply to employees or other individuals in the field of public law enforcement or who dispense or have access to narcotics or dangerous drugs.

Appellants argue that this section, which became effective in 1973, answered the admissibility question in the form of a public policy declaration by the legislature that any lack of accuracy which may be inherent in polygraph testing is outweighed by the need for extreme caution in hiring and retaining certain types of personnel. In support of this contention they refer us to *McMullin Appeal,* 41 Pa. Commonwealth Ct. 474, 401 A.2d 572 (1979), wherein we made the following observation:

If the employing agency may require submission to a polygraph test as a condition of continued employment, then it surely can dismiss an employee on the basis of test results. Otherwise the anomalous result would be that, while the agency could require that the employee take the test or resign, it could not use the results of the test in making a decision as to the employment status of the employee. It seems, therefore, that an adjudicative body could consider the properly admitted results of a polygraph test when the issue before it relates only to the suitability for continued employment in the field of public law enforcement.

*Id.* at 476 n. 1, 401 A.2d at 574 n. 1.

After thoroughly analyzing the *McMullin* case, the court of common pleas concluded that the above quoted statements amounted to non-binding dicta. We agree.

*McMullin* concerned a dismissal hearing against a police officer much like that currently under review. However, in that case we held *only* that mere references to a polygraph examination were non-prejudicial where the results of the examination were not relied upon by the adjudicative body and the officer's dismissal was supported by other substantial evidence in the record.

On its face, Section 7321(b) is purely an exculpatory provision. We do not believe it was intended to have any impact as a rule of evidence. Furthermore, even if this section is to be interpreted as permitting employers to discharge certain employees upon their refusal to take a polygraph test,[4] prohibiting the results of these tests from being entered into evidence would not necessarily present an anomalous stance. On the contrary, if an employee is to be faced with the threat of job loss upon his refusal to submit to such a test, we believe there is even *more* reason to protect that employee from the risk that an inaccurate result may be used against him in a judicial or quasi-judicial proceeding. As the common pleas court astutely recognized, excluding these results as evidence will by no means defuse them as an instrument of employment decision making. They may still be used as a valuable investigative tool within the particular department.

For our purposes, the current state of the law in this Commonwealth remains as stated by the Pennsylvania Supreme Court in the 1976 case of *Commonwealth v. Gee,* 467 Pa. 123, 354 A.2d 875 (1976): "[T]he results of a polygraph examination are inadmissible for *any* purpose in Pennsylvania because the

---

[4] Although this would appear to be an inevitable effect of the plain statutory language, we are expressing no opinion at this time as to whether or not it is a correct interpretation. We note that the law prior to 1973 held to the contrary. *DeVito v. Civil Service Commission,* 404 Pa. 354, 172 A.2d 161 (1961).

scientific reliability of such tests has not been sufficiently established." *Id.* at 141, 354 A.2d at 883 (emphasis added).[5] Nevertheless, this is not quite the end of our analysis. We are also cognizant of the further statement in *Gee* that "it is incumbent upon us to be alert to developments in this field so that, if indeed lie detectors have passed beyond the experimental stage to a truthworthiness comparable to that of other scientific tests whose results have immeasurably aided our courts in their search for truth, we do not deny ourselves the enlightenment they might provide." *Id.* at 142, 354 A.2d at 884.

In the context of the instant case, however, we find no need to go beyond the concise "state of the art" of polygraphy which was presented at the dismissal hearing by Appellant's expert witness, the polygraph examiner who conducted the tests on the Appellee. Although this witness did present a picture of a developing science which, at least in his own opinion, had increased in accuracy since its inception, he presented no concrete evidence of the reliability of polygraph tests in general. The court pointed out the following testimony which was elicited from the expert on cross-examination:

> Q. Let's talk about testing, Mr. Criswell, as far as responses by individuals.
>
> First of all, are there factors that will create certain physiological responses from persons?
>
> A. Yes, sir.
>
> Q. What are those factors?
>
> A. Outside noises, any physiological problems they might have concerning maybe—maybe [sic] they have a stomach ache, a headache,

---

[5] The *Gee* court cited *DeVito*, among other cases, in support of this broad statement.

or something of that nature, anger, many things like that.

Noting that the Appellee had been *ordered* to take the test, the court also referred to testimony of the expert witness which established that, according to all respected schools of thought in polygraphy, a person should never be coerced or required to take a polygraph test due to the risk that such an order could itself create physiological responses in the subject making him untestable.[6]

The trial court found that this testimony reestablished the unreliability of polygraph tests in general, and also established that the specific circumstances attending Appellee's test had made his results particularly suspect. The court concluded that consequently, the Board's essential finding of fact that Appellee had given "deceptive and untruthful answers" during the test was not supported by substantial evidence in the record. We agree.

We will affirm the order of the court.

### ORDER

Now, July 18, 1985, the Order of the Court of Common Pleas of Cumberland County, No. 334 Civil Docket of 1984, dated September 28, 1984, is hereby affirmed.

---

[6] Our own review of the record reveals additional circumstances which conceivably could have skewed the test results. For example, a different testing technique was employed on Appellee than that which was employed on all the other subjects. This was due to Appellee's objection to answering certain "control questions" (having no relation to the investigation) which had been asked of the other subjects.