596 A.2d 144

**Bryan J. QUIGLEY, Appellant,**

v.

**PHILADELPHIA CIVIL SERVICE COMMISSION, Appellee.**

Supreme Court of Pennsylvania.

Argued April 5, 1990.

Decided Aug. 29, 1991.

F. Emmett Fitzpatrick, III, Philadelphia, for appellant.

Ralph J. Teti, Chief Deputy Litigation, Susan Shinkman, Divisional Deputy City Sol., for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION OF THE COURT

ZAPPALA, Justice.

The Appellant, Bryan J. Quigley, was dismissed from the Philadelphia Police Department in October of 1982 and arrested on charges of obstruction of law, hindering apprehension or prosecution, criminal conspiracy, and criminal solicitation. At a subsequent jury trial he was acquitted of all charges.

In 1986, the Civil Service Commission denied Quigley's appeal of his dismissal, which decision was affirmed by the Court of Common Pleas and, on further appeal, by the Commonwealth Court Pa.Cmwlth., 557 A.2d 468 (1989). We granted allocatur to review the single question whether references during the hearings to a polygraph examination given to one of the City's key witnesses constituted an error of law.

The Notice of Dismissal stated the following:

On 10–24–82 you did stop Mr. Richard Edgerton, 3500 Fairmount Ave. at 37th & Aspen Streets for a traffic violation and when asked for his drivers license, he could not produce it. A search of Mr. Edgerton revealed a bag of Marijuana and a piece of paper with numbers on them (sic). You along with your partner Officer Toner, did ask Mr. Edgerton which offense he wanted to be arrested for (Marijuana or Numbers). You along with Officer Toner did tell Mr. Edgerton to return on 10–25–82 at 4:00 P.M.

to 35th & Fairmount Avenue to bring a slip with thirty five (35) or forty (40) numbers on it. Mr. Edgerton was told that he would be arrested at that time and would only be held in custody for a short time. Acting in your capacity as a Philadelphia Police Officer, you issued Mr. Edgerton a traffic citation and released him. Mr. Edgerton was not charged with Possession of Marijuana or Illegal Lottery at this time. The Marijuana was returned to Mr. Edgerton by yourself but you did retain the number plays.

. . . .

Additionally, on 10–26–82, you, along with your partner Officer Shellenberger, did arrest Mr. Richard Edgerton of 3500 Fairmount Avenue at 35th and Fairmount Avenue at approximately 4:35 P.M.

On Sunday, 10–24–82 Mr. Edgerton was instructed by you to appear at the above location with thirty five (35) or forty (40) number plays and that he would be arrested at this time for Illegal Lottery. You made this demand in return for releasing Mr. Edgerton (10–24–82) after finding him in possession of marijuana.

The facts and locations of this arrest as related to police on Official Police Department Forms (75–48 and 75–50) submitted by yourself were false and were known to be false when written by yourself.

Seized from Mr. Edgerton was a piece of paper with two (2) rows of illegal 'number work'. This was the 'number plays' you told Mr. Edgerton to return with. When this evidence was recorded on property receipt $ 891327 by Officer Shellenberger, half of the paper containing one (1) row of 'numbers plays' had been torn off and was missing.

Mr. Edgerton's arrest was prearranged by yourself and Officer Shellenberger. This arrest resulted from evidence you knew was false. Knowing that the arrest was false and that your conduct was illegal, you and Officer Shellenberger arrested and detained Mr. Edgerton, seized false evidence from him and denied him the exercise and

enjoyment of his freedom. The above indicated that you and Officer Shellenberger did intentionally impair, pervert and obstruct the administration of law.

. . . .

The above course of conduct indicates that you have little or no regard for your responsibilities as a member of the Philadelphia Police Department.

At the hearing, the City presented Richard Edgerton as a witness. By Edgerton's account, on the evening of Sunday, October 24, 1982, he was stopped by Officer Quigley for running a stop sign, and was unable to produce a driver's license. He further testified that Quigley directed him to empty his pockets, which he did, removing a bag of marijuana and his wallet, which contained a piece of paper with two three-digit numbers on it. According to Edgerton, after Quigley asked which offense he wanted to be arrested on (to which he replied neither), Quigley returned the marijuana and instructed Edgerton to meet him the next day at 35th and Fairmount and to have between thirty-five and forty numbers on him.

Edgerton testified that he did not meet Quigley the next day because he was sleeping, but on Tuesday he called the Internal Affairs division of the Police Department and related the above story. He then met with Lieutenant Losco, who asked him to write down some numbers and return to 35th and Fairmount. After waiting there in his car for several hours, Edgerton testified, he saw a police car go to the housing project at 35th and Fairmount and later leave with a woman and her children. As they left, he said, the car stopped beside his car and Quigley got out and asked Edgerton if he had the numbers. Edgerton testified that he gave Quigley the paper and Quigley returned it, telling Edgerton to wait until he had taken the woman and her children to the hospital. According to Edgerton, upon Quigley's return he moved his car to the other side of the street, gave Quigley the paper with the numbers, and got into the police car.

Losco testified that he had met with Edgerton, who told him that although he could not identify the police car number or officers' badge numbers on Sunday evening, he recognized them when, from his apartment building, he saw car 1616 and the same officer pull up behind his car on Monday afternoon at the appointed time. It was this, he told Losco, that prompted him to take the events of the previous night more seriously and caused him to call Internal Affairs. After further discussion, Losco testified, he told Edgerton to create a paper with numbers, gave him some money, and told him to go to 35th and Fairmount, where Losco set up surveillance. There, Losco observed patrol car 1616 pull alongside Edgerton's car and a white object, which Losco assumed was the piece of paper with numbers, being held up. When the police car returned, Losco observed Edgerton move his car to the other side of the street and walk back to the police car. After a few minutes, he saw Edgerton remove his cap and scratch his head, the signal he had been instructed to give when the officers had either the numbers or the money in their possession. Edgerton was then placed in the car and the surveillance was terminated.

Quigley testified that he had indeed stopped Edgerton on Sunday, October 24, 1982, and issued a citation for driving without a license. Quigley also testified that Edgerton continually tried to persuade him to not write the ticket by offering to supply him with information about drug sales and numbers operations in the area. He denied finding any marijuana or other contraband and denied making arrangements to meet Edgerton at a future time. According to Quigley, he next saw Edgerton two days later when Edgerton flagged his patrol car down while it was en route to the hospital from the housing project. At that time, Edgerton again offered to supply information about illegal activities in the area, and Quigley told him to wait until he returned. When he did return, Quigley testified, Edgerton asked that they talk somewhere else, since he lived in the neighborhood and didn't want to be seen giving the police informa-

tion.  After they had gone a short distance, however, Quigley realized that Edgerton wanted to make a deal so that the police would not give him any more trouble about driving, and he was only offering information that was common knowledge.  Therefore, Quigley was put out of the car on 36th Street between Haverford and Spring Garden, about two and a half blocks from where he had gotten in. According to Quigley, the officers continued on routine patrol of the neighborhood, and encountered Edgerton again just a few minutes later, leaving a known numbers house on the corner of 35th Street and Haverford.  It was then that he discovered the sheet with numbers on it protruding from Edgerton's pocket, and Edgerton was arrested.

■ On a number of occasions during their direct examination, Edgerton and Losco referred to the fact that Edgerton had been given a lie detector test after the initial interview and before he had been sent back to 35th and Fairmount with money and a sheet of numbers.  On each occasion, objections to the testimony were overruled.  On cross-examination, Losco acknowledged that Edgerton admitted to having lied in his initial interview.  Contrary to the first explanation he gave Losco as to what prompted him to approach Internal Affairs, Edgerton later told him that on Sunday October 24, he did not know the number of the patrol car or the name or badge number of the officer, and that he did not see police car 1616 pull up behind his car on Monday afternoon (and thus he could not have recognized either the car or the officer from the night before.) On redirect examination, counsel for the City sought an explanation from Losco as to the reason Edgerton had given for initially telling the lie, that being that Edgerton's friends supposedly had seen officers observing his car and he did not want to get them involved.  In the course of trying to elicit this response, counsel sought to make use of the report of the polygraph examination to refresh Losco's recollection.  Objection to use of the document was sustained, but when Losco ultimately was able to refresh his

recollection from his notes, counsel for the City pursued the matter by inquiring

Q. When did he tell you this information?

A. Just before he took the exam.

Q. Polygraph exam?

A. Yes, sir.

R. 122a. The Commission sustained counsel's objection and motion to strike this exchange. Nevertheless, one of the Commissioners was clearly concerned about why the Bureau would pursue an investigation when the individual making the allegations could not himself identify the officers he was accusing and in fact had admitted to Losco that he had lied about seeing the officer at the time and place allegedly arranged the night before. The following exchange then occurred.

DR. BAILEY: One question, Captain, while we have you on the stand; you have a witness here who has testified to certain things which are, of course, alarming, to say the least, to the Commissioners. When this individual came to you and said he had certain information with regard to certain police officers and by the testimony, without knowing the car number and without knowing the badge numbers of the police officers—now that we've heard something about this person's background— why wouldn't Internal Affairs look into the background of this particular individual before you make a commitment to follow up whatever it is he had to say?

WITNESS: Well, first of all, I wasn't in charge of the investigation so I would not be the one to determine how far it would go forward and at what point; but I think it has been testified before, not in this proceeding—to give an example, you can rape a prostitute—no matter what his—I don't look at the record of a complainant that comes in that tells me about the police; I look at the individual; I talk to him, talk to him numerous times, get an idea, get a feel of the man, see if I can determine if he's telling the truth through the investigation that I'm trying to conduct; if I don't have a lot of time, I do the

best I can. The man took a polygraph exam; I asked him over ...

R.124a–125a. Counsel's objection to this last remark was sustained.

■ In rejecting Quigley's argument that the numerous references to Edgerton's polygraph examination constituted reversible error, Commonwealth Court began by citing *Township of Silver Spring v. Thompson*, 90 Pa.Cmwlth.Ct. 456, 496 A.2d 72 (1985). In that case the court held that the results of lie detector tests are inadmissible for any purpose. In the present case, said the court, "the commission neither admitted nor considered Edgerton's polygraph results as a basis for the findings." Slip opinion at 5 (footnote omitted). The court, therefore, found *McMullin Appeal*, 41 Pa.Cmwlth.Ct. 474, 401 A.2d 572 (1979) (mere references to polygraph examination not prejudicial where examination results were not relied on and dismissal was supported by other substantial evidence), controlling, and distinguished *Ross v. Civil Service Commission*, 98 Pa. Cmwlth.Ct. 565, 511 A.2d 941 (1986) (case remanded for new hearing where Commission permitted witness to testify regarding results of polygraph test).

Although we agree with the legal precepts cited by Commonwealth Court, we disagree with their application on this record. Curiously, the court below acknowledged that "the commission's opinion contains a statement that Edgerton 'passed a lie detector test'," but treated this observation as of no significance, noting only that "that statement is not supported by the record." Slip opinion at 5, n. 2. In our judgment, the statement referred to, though indeed not supported by the record, establishes that the numerous references to the polygraph examination and the context in which they were made caused the Commission to infer that Edgerton had passed the test. In *Commonwealth v. Johnson*, 441 Pa. 237, 272 A.2d 467 (1971), this Court considered a similar problem in the setting of a criminal trial. In that case, defense witnesses testified that the Commonwealth's witness had told them he had committed the crime alone,

but after speaking to police had changed his story to implicate the defendant. The Commonwealth, in rehabilitating its witness, made reference to a lie detector test, although the actual results of the test were not admitted. We reversed the judgment of sentence and remanded for a new trial, stating

> [w]e agree that the witness's testimony was incurably bolstered by the reference to the lie detector test ... the charge of the trial court instructing the jury to limit its considerations strictly to the fact that the test had been administered could not remove the prejudice.

441 Pa. at 242, 272 A.2d at 470.

In reviewing this record, it is apparent that resolution of the matter before the Commission turned entirely on the assessment of the credibility of Edgerton and Quigley. Losco's observations were consistent with both men's descriptions of the events, and thus provided no greater support for the one than for the other. In its conclusions, the Commission began by stating its finding that "Edgerton's testimony is credible". In light of the numerous references to the polygraph examination and the Commission's explicit misstatement that Edgerton had passed that examination, we are unable to agree with the Commonwealth Court that these references were incidental and non-prejudicial.[1] Although the results of the test were not

---

1. The conclusion is inescapable that the Commission's tainted finding as to credibility affected its view of the entire record. For example, although the Commission determined that "it was more than coincidental that the Quigley–Edgerton rendezvous occurred at the time and place which Edgerton advised it would happen," the record plainly shows that Edgerton mentioned a Monday afternoon meeting, and Quigley's encounter occurred on Tuesday afternoon in the course of a routine response to a radio call. By way of further example, the Commission stated "[b]oth Captain Losco and Edgerton testified that the meeting occurred at 35th and Fairmount but appellant Quigley testified that it happened at 35th and Haverford." In fact, Quigley acknowledged that he encountered Edgerton at 35th and Fairmount; he claimed that the arrest was made at 35th and Haverford, after Edgerton had been driven a few blocks from 35th and Fairmount, put out of the car, and encountered again several minutes later at 35th and Haverford, all after Losco's surveillance had been terminated. And finally, although the Commission by rhetorical question indicated

themselves admitted, the references that were permitted unavoidably raised an impermissible inference of the test results.

For the foregoing reasons, the orders of the lower courts affirming the decision of the Civil Service Commission are reversed. The case is remanded to the Philadelphia Civil Service Commission for a new hearing without reference to the polygraph examination.

LARSEN, J., files a concurring and dissenting opinion.

LARSEN, Justice, concurring and dissenting.

I agree that the numerous references to the polygraph test that had been administered to the Commonwealth's principal witness, Richard Edgerton, were prejudicial and so tainted the Commission's findings pertaining to credibility as to require a new hearing. I, however, disagree that we should simply, generally and without qualification remand this case to the Commission for a new hearing sans reference to the polygraph examination. If any of members of the present Philadelphia Civil Service Commission was a member of the Commission in 1986 which heard and denied Appellant Quigley's appeal of his dismissal from the Philadelphia Police Department, such member must be disqualified from participating in a new hearing. The taint to the Commission which resulted from the many references to the lie detector test made by the prosecution in the original hearing lingers with those Commission members and will prejudice the appellant in any new hearing before a Commission which includes any of the same members. Those original members heard repeated references to the polygraph examination and the implication that the results were positive. The impact of the references to the polygraph test upon the Commission members is obvious. The Com-

that Losco would have no apparent motive for falsifying a location or framing colleagues, it gave no thought to the question why Quigley would forgo a certain vice arrest upon finding numbers and marijuana in Edgerton's possession in order to fabricate a numbers arrest the next day.

mission, without having the precise results of the test before them, specifically noted in its opinion of September 24, 1986, that the witness Edgerton "was given and passed a lie detector test." (R.R.–182a).

The prosecutor, by his numerous references to the polygraph examination, polluted the waters of justice. That pollution cannot be obliterated by merely filtering out the contaminant before plunging anew into the same waters. All that is accomplished by such action is the prevention of further and additional contamination from the same source. The original pollution remains unabated.

The majority's remand to the Philadelphia Civil Service Commission for a new hearing without reference to the polygraph examination could very well place the appellant before one or more of the same Commission members who were apparently influenced by the initial prejudicial references to the test. The fact that the prosecution is precluded from any mention of the polygraph test in the new hearing does not erase the original taint caused by the repeated references to the test at the original hearing. The individual Commission members who listened to those numerous references to the polygraph test and who drew the inference that the witness Edgerton had "passed" the test, cannot forget those references and that inference. The entire proceeding must be cleansed of the pollution and that means that the appellant is entitled to a new hearing before an entirely new tribunal. We must be scrupulous in insuring that every person who is accused of wrongdoing and whose liberty and/or substantial property interests are at risk is afforded a fair trial before a fair and impartial tribunal. The fundamental requirement of due process, which is applicable to adjudicative hearings before administrative tribunals where substantial property rights are at stake, *Soja v. Penna. State Police*, 500 Pa. 188, 455 A.2d 613 (1982), demands no less.

"The untainted administration of justice is certainly one of the most cherished aspects of our institutions. Its observance is one of our proudest boasts."

*Communist Party v. Subversive Activities Control Board,*
351 U.S. 115, 124, 76 S.Ct. 663, 668, 100 L.Ed. 1003 (1956).

I would remand this case for a hearing before a hearing tribunal comprised of members who did not participate in or have any connection with the original hearing held in this matter in 1986. If a new hearing before an untainted Commission is not possible at this time, then the charges against the appellant Quigley should be dismissed.