Charles A. SCHMIDT and Richard H. Greene, Plaintiffs,

v.

BOROUGH OF STROUDSBURG, Chester Gross, John Pansy, and the Civil Service Commission of the Borough of Stroudsburg, Defendants.

Civ. No. 92–521.

United States District Court, M.D. Pennsylvania.

June 3, 1993.

**640**

Richard J. Orloski, Orloski & Hinga, Allentown, PA, for plaintiffs.

Joseph A. O'Brien, Oliver, Price & Rhodes, Scranton, PA, Ralph A. Matergia, Matergia & Dunn, Stroudsburg, PA, Stephen D. Ellis, Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, for defendants.

## *MEMORANDUM*

NEALON, District Judge.

In this 42 U.S.C. § 1983 civil rights complaint, the plaintiffs, Charles A. Schmidt and Robert H. Greene, have alleged violations of the Fifth and Fourteenth Amendments, specifically, the deprivation of a property interest in being denied eligibility for, and the actual position of, police officer for the Borough of Stroudsburg, Pennsylvania. In essence, the plaintiffs contend that the defendants conspired to "fix" the qualifying examinations in order to appoint Kenneth Nevil to the position of patrolman, thereby denying the opportunity for employment to them. Currently before the court is the defendants' motion for summary judgment. For reasons which follow, the motion will be granted.

## BACKGROUND

Due to the nature of the plaintiffs' complaint, wherein it is alleged a conspiracy took place among the defendants to deprive them of their constitutional rights, a recitation of the events which gave rise to this action is in order.[1] In January of 1987, the Borough of Stroudsburg, through its Borough Manager, in compliance with its Civil Service Commission Regulations, announced that it was to offer a test to responding candidates for the purpose of updating the borough's "certified" list of eligible candidates for the position of police patrolman. This announcement was made by means of public notice and the testing procedure consisted of a written and oral section, both of which were required by the borough's civil service regulations as well. The commission interpreted its regulations to allocate 70% to the written test and 30% to the oral interview in computing a final score.

On January 10, 1987, the written portion of the exam was administered at which time thirteen (13) candidates sat for the test. Among this group were the plaintiffs. As a prerequisite to becoming eligible for the oral part of the certification process, the borough's civil service regulations required candidates to achieve a score of at least seventy percent (70%) on the written exam. Of the candidates, ten (10) achieved grades which allowed them to proceed to the oral portion of the exam. Again, among this group were the plaintiffs.

Those ten candidates were then invited to participate in the oral examinations conducted by three members of the Borough's Civil Service Commission. These oral examinations were held on two separate evenings in January, 1987, specifically, Tuesday the 13th and Thursday the 15th. Interviewed on the

---

1. The parties have had full opportunity to develop the record in this matter by way of deposition testimony, discovery, oral argument and affidavits in support of, and in contravention to, the undisputed statement of facts as required by Local Rule 401. In fact, a jury has been chosen but the trial has been delayed pending consideration of the present motion.

first date, the 13th, were the following candidates: Beaver, Nevil, Miller, Brooks, and Miscik. The remaining five candidates, Thomas, Hoff and Kimmins, as well as the plaintiffs, Schmidt and Greene, were interviewed on Thursday, January 15, 1987.

As with the written portion of the test/certification process, the civil service commission also required the candidates to achieve a score of seventy (70%) percent on the oral portion of the test in order to be "certified" by the commission.[2] The oral portion of the test consisted of a question and answer type interview conducted by three civil service commissioners. There were a total of 30 points available on the oral section of the exam. The interviewers rated the candidates on a scale of one (1) through five (5) in the following five categories: Appearance, Manner, Speech, Adaptability and General Impression. The candidate can earn 25 points from the interview process and an additional one (1) to five (5) points for his/her written statement explaining why she/he wanted to become a police officer.

The first set of interviews, which took place on January 13, 1987, were conducted by three civil service commissioners, Miles Kirkhuff, Mary Jean Knapik and Stuart Woody. Also in attendance for the interviews were Borough Manager Carl Rodgers and Police Chief John Pansy.[3] On the date of the second round of interviews, January 15, 1987, Stewart Woody[4] was not present and, therefore, did not participate in the interviewing process that evening. Commissioners Kirkhuff and Knapik were present on the 15th, as were Rodgers and Pansy. All those present at the interviews, on both occasions, graded the prospective candidates. The usual procedure was to use only the scores of the three commissioners in calculating the candidates' performance. These three marks would then be added together and divided by three. This result, known as the weighted score, was the figure used to determine whether the candidate had achieved at least a seventy percent (70%) (or 21 points out of the possible 30) as required by the commission, based on their interpretation of the rules, to be eligible for placement on the "certified list." Due to the fact that Mr. Woody was absent on January 15th, the commissioners decided not to use his evaluations of the candidates prepared on January 13, 1987. Instead, a decision was made by the two remaining commissioners to use the evaluations prepared by Chief Pansy, assisting as the third examiner, for both sets of interviews. Borough Manager Carl Rodgers tabulated the results after the Commission members graded the oral examinations.

As a result of the oral test, candidates Kenneth Nevil[5], Brian Kimmins and plaintiff Richard Greene received grades of twenty one (21), or greater, and in doing so achieved marks above the seventy (70%) percent re-

---

2. This requirement of achieving a score of at least seventy percent (70%) on the oral portion of the exam is one of the primary legal issues raised by the plaintiffs and is the foundation of their complaint. (Both parties agree that a 70% score on the written portion is required to proceed to the oral evaluation level.) The plaintiffs contend that the civil service commission misinterpreted their own regulations by requiring a seventy percent (70%) score on the oral section of the test. They maintain that the correct interpretation of section 601 of the Police Civil Service Rules and Regulations require those candidates competing for the position of patrolman to achieve only seventy percent (70%) on the written portion of the test. They contend that a proper interpretation of the regulations does not require that a seventy percent (70%) grade be achieved on the oral section in order to progress through the certification process, and ultimately to be eligible to be placed on the list. This topic will be addressed in greater detail in the analysis portion of this memorandum.

3. A review of the depositions of Kirkhuff an Knapik reveals that Chief Pansy was present at the interviews, at their request, for the purpose of lending a more technical aspect to the questions posed to the candidates. *See the depositions of Knapik at 21–21, and Kirkhuff at 57–59.*

4. According to the defendant's brief, Woody was unable to attend due to illness.

5. The plaintiffs allege that it is this candidate, Kenneth Nevil, who the defendants favored over them. They maintain that in order to insure that Mr. Nevil was hired as a patrolman by the Borough of Stroudsburg, the defendants called for the creation of a new certified list, changed the oral scoring sheets, allowed defendant Pansy to function as a civil service commissioner, among other allegations, which resulted in his being on the certified list, and ultimately being hired as a patrolman.

quired by the commission's interpretation of the civil service regulations to be eligible for appointment to the position of patrolman.[6] Plaintiff Schmidt, although the candidate ranked fourth, did not achieve a score above the seventieth percentile and was, therefore, not eligible for inclusion on the certified list.[7] Ultimately, Nevil and Kimmins were chosen in 1987 by the borough council for the two positions that were available. The plaintiffs continued to pursue the position of patrolman, without complaining or accusing anyone of any wrong-doing regarding the 1987 exams, and were eventually hired in 1989.

There were no other factual developments until 1989 or early 1990, when the Civil Service Commission was conducting a new written test for patrolman certification. At that point, Patrolman John Baujan was standing outside the room where the test was being administered, in the presence of Mayor Gross and Police Chief Pansy, when it was reported that an applicant, Heath Williams, had just failed the written portion of the examination. According to Baujan, he overheard Mayor Gross make the following remark:

> So him and the Mayor—John Pansy that is—him and the Mayor got involved in a conversation about that it was a shame that he didn't pass the test. Because if you don't pass the test thats (sic) it as far as your hiring process goes at that time. And then the Mayor responded something to the effect that its too bad we couldn't do something for him, referring back to Ken-

ny, because Kenny Nevil didn't pass either. I don't know if he exactly referred to the test, but it was that he didn't pass either. *See document 41, p. 7, line 1, of the record.*[8] There is no indication that Pansy heard, reacted or responded to this statement. Baujan testified that he interpreted the remark to mean that a particular candidate (Kenneth Nevil) had apparently failed the written portion of the exam in 1987, and that somehow Pansy and Gross were able to assist the candidate in achieving a passing score.[9] It was this statement, that Baujan related to Greene in 1991 which caused the plaintiffs to conclude that a conspiracy existed in 1987 to deprive them of their place on the certified list, and ultimately employment as patrolmen.

## ANALYSIS

### I. The Conspiracy

When considering a § 1983 action which is based on an alleged conspiracy of the defendants to deprive the plaintiffs of some constitutionally protected right, "... the plaintiff is required to support his broad-ranging allegations of conspiracy with more than speculation and conjecture. He must allege supporting facts showing *an agreement* among the numerous defendants, as well as the basis for alleging participation with respect to each defendant." *Flanagan v. Shively*, 783 F.Supp. 922, 933 (M.D.Pa. 1992) (emphasis supplied). The United States Court of Appeals for the Seventh Circuit in *Kunik v. Racine County, Wis.*, 946

6. The actual oral scores for the plaintiffs, as well as Nevil and Kimmins, were as follows:

| | KIRKHUFF | KNAPIK | PANSY | WOODY | AVERAGE |
|---|---|---|---|---|---|
| KIMMINS | 28.8 | 26.4 | 30 | N/A | 28.4 |
| NEVIL | 27.6 | 22.8 | 26.4 | 30 | 25.6 * |
| GREENE | 21.6 | 22.8 | 20.4 | N/A | 21.6 |
| SCHMIDT | 22.8 | 18.6 | 16.8 | N/A | 19.4 |

* The average score of candidate Nevil does not include Woody's evaluation. Candidates Schmidt, Greene and Kimmins were interviewed on the 15th of January, 1987, the date on which Mr. Woody was absent, therefore no scores are available for these candidates from Mr. Woody.

7. The final scores of the three candidates who made the certified list, in descending order, are as follows: Kimmins—89.4, Greene—76.6, and Nevil—76.6.

8. According to Baujan, for the written tests, the applicants were identified by number and not by name. Upon completion and correction of the

tests, the marks were posted by the candidates' number.

9. This interpretation is puzzling inasmuch as Nevil actually passed the written examination with a mark of 71.8% or 51 correct answers out of a possible 71 questions.

F.2d 1574 (7th Cir.1991), has noted that to determine whether a complaint alleges a conspiracy:

> There must be allegations that the defendants directed themselves toward the unconstitutional action by virtue of a mutual understanding. Even where such allegations are made, they must further be supported by some factual allegations suggesting such a "meeting of the minds."

*Id.* at 1580 (citing *Sparkman v. McFarlin,* 601 F.2d 261, 268 (7th Cir.1979). The plaintiffs claim that in order to achieve that goal, the defendants: 1) called for the abolition of an existing list of certified candidates and scheduled a new set of exams; 2) allowed Chief Pansy to attend the oral portion of the exam and score the candidates; 3) used those scores in the actual calculation of the candidates weighted oral scores (which, in effect, utilized Pansy as a member of the Civil Service Commission in contravention of the borough's civil service regulations); 4) changed the score of Commissioner Mary Jean Knapik for Kenneth Nevil from 17 to 19; 5) and, finally, computed a one (1) point mathematical error in favor of Kenneth Nevil on the oral evaluation of Commissioner Miles Kirkhuff. Furthermore, the plaintiffs maintain that but for the inclusion of John Pansy's illegal score, Kenneth Nevil would not have made the certified list.

A brief outline and analysis of the events that the plaintiffs claim establish this conspiracy is appropriate at this time. Plaintiffs Greene and Schmidt took the written portion of the patrolman's exam on January 10, 1987, as did Nevil and Kimmins, the other two candidates who made the certified list. All four men received grades that placed them in the seventieth (70%) percentile, thus allowing them to proceed to the oral portion of the exam. There are no allegations, nor do the plaintiff's draw any inferences, that seventy (70%) percent was not required on the written portion of the exam.

Accordingly, Kenneth Nevil, as well as Schmidt and Greene, among others, were invited to participate in the oral examinations. As previously stated, the decision was made to use Chief Pansy's gradings inasmuch as Commissioner Woody was absent for the January 15th interviews. The plaintiffs contend that the decision to allow the use of Pansy's scores on the oral portion of the exam demonstrates that the defendants attempted to ensure Nevil's place on the certified list.[10]

■ As to plaintiff Greene, his only contention is that Nevil should not have been placed among the top three and that such placement somehow impacted on his constitutional rights. However, as will be explained later, the elimination of Nevil would not have required the appointment of Greene. The borough council still retained the discretion to appoint or reject any name on the list. Consequently, his action is meritless.

■ It is also asserted that when the score of Pansy is not factored into the weighted score, Nevil is relegated to forth place and Schmidt becomes number three, and as, such eligible for the certified list. This is simply not the case. The plaintiffs reach that conclusion by ignoring the Commissioners' interpretation of their own regulations. The Commissioners interpreted their regulations, specifically § 603 of the Borough of Stroudsburg Police Rules and Regulations, to require a score of seventy percent (70%), or at least 21 points, on the oral exam, in order to be placed on the certified list of candidates.[11] Section 603 provides as follows:

> The court recognizes that the use of Pansy's scores *may* be a violation of § 607 of the Borough's Civil Service Rules and Regulations, entitled "Administering Exams," but this, in itself, does not require a conclusion that a conspiracy existed or that the plaintiff's constitutional rights were violated.

---

10. According to the plaintiff, this decision by Kirkhuff and Knapik to use the scores of Pansy, because he was present for both sets of oral interviews, in lieu of Woody's, who was not present for the second round of interviews on January 15th, further demonstrates that a conspiracy existed to "fix" the exams. This is the extent of the allegation. There has been presented no evidence to support the claim that Woody called in sick on January 15, 1993, in furtherance of the conspiracy. In fact, Mr. Woody was not even deposed in order to pursue that line of inquiry.

11. *See supra* pp. 640–641 for a complete explanation of the certification process.

*Passing Grades*—The minimum passing grade for an examination for the position of patrolman shall be a score of seventy (70) percent. The minimum passing grade for an examination for the position of Corporal, Sergeant, and Assistant Chief of Police shall be a score of seventy-five (75) percent, and each applicant for any such position shall score at least seventy (70) percent on each part of the examination.

"The interpretation given [a] regulation by the state agency charged with its administration is entitled to great deference" *Rogers v. Bucks County Domestic Relations Section,* 959 F.2d 1268, 1273 (3rd Cir.1992) (*citing Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965)), and should be given substantial weight "unless it is plainly erroneous or inconsistent with its own regulations." *Disabled in Action of Pennsylvania v. Sykes,* 833 F.2d 1113, 1117 (3rd Cir.1987); *Dept. of Navy, Military Sealift Com. v. F.L.R.A.,* 836 F.2d 1409, 1410 (3rd Cir.1988); *Director, OWCP, U.S. Dept. of Labor v. Mangifest,* 826 F.2d 1318, 1323 (3rd Cir.1987); *U.S. v. Alcan Aluminum Corp.,* 964 F.2d 252, 263 (3rd Cir.1992); *Bowles v. Seminole Rock and Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945).

A reading of § 603 by a layperson, who is neither schooled in the law nor statutory construction, could fairly result in an interpretation of the section as requiring a seventy (70%) percent score on the oral portion of the examination. Since Schmidt, with or without Pansy's participation, did not achieve a total of 21 points in the oral interview, he did not qualify for certification. Accordingly, the plaintiff's argument that when Pansy's scores are not utilized, Nevil does not qualify and Greene is elevated to the top three on the certified list, is unfounded. The following synopsis of the plaintiff's scores demonstrates the point.

Schmidt was graded at 22.8 by Kirkhuff, and 18.6 by Knapik. The combination total was 41.4, which when divided by two (the procedure for achieving the weighted score is to add the totals together and divide by the number of evaluators, in this case two) would equal 20.7, a mark below the 21 points needed to be placed on the eligibility list under the Borough's civil service rules and regulations, § 603.[12] Schmidt received a grade of 16.8 from Pansy which similarly would make him ineligible.

The plaintiffs also maintain that the grading sheets from the oral evaluations contain changes that further reveal a conspiracy existed among the defendants. They allege that corrections of the one point mathematical error in favor of Nevil by Kirkhuff and the two point error by Knapik would have placed Greene ahead of Nevil on the list, even if Pansy's "illegal" score were included.[13] However, when the scores of each candidate are calculated, using the seventy percent threshold requirement on the oral exam, as the commissioners did, no combination of calculations will result in any other outcome than that Kimmins, Greene and Nevil qualified for a place on the certified list.[14]

---

**12.** It should be pointed out that when the scores Nevil received from Kirkhuff, 27.6 and Knapik, 22.8 are added, (50.4) and then divided by two, a qualifying grade of 25.2 would be attained. Interestingly, Woody gave Nevil a perfect mark of 30. If his tally had been used instead of Pansy's, in combination with the other two commissioners, his weighted score would have been 26.8.

Additionally, the Borough of Stroudsburg Police Civil Service Rules and Regulations require only a two member quorum and as such the evaluations of Kirkhuff and Knapik would be sufficient to generate a legitimate certified list. *See Police Civil Service Rules and Regulations for the Borough of Stroudsburg § 205 (1983).* Therefore, with or without the use of Pansy's evaluations, when the scores of the two commissioners are calculated, Nevil's mark (25.2) was high enough for his name to be placed on the certified list while Schmidt's (20.7) was not.

**13.** When the computations given Nevil by Kirkhuff (27.6) and Knapik (22.8) are adjusted to reflect corrections of the alleged errors, there is no change in the outcome of the certified list. Kirkhuff's total would be reduced by one point, or 26.6, and Knapik's would by two, or a 20.8. When these adjusted scores are added together (47.4) and are then divided by two, the result is an average of 23.7, an amount well above the 21 points needed to be placed on the certified list. There are no allegations that Schmidt's sheets were altered in an attempt to lower his score.

**14.** Borough Manager Carl Rodgers, the person who was responsible for putting into motion the

Consequently, the factual predicates underlying the plaintiffs' argument do not survive careful review of the record. There is no evidence of any improper basis for scheduling a new set of exams in January, 1987; the corrected scores of Commissioners Kirkhuff and Knapik did not alter any candidates eligibility or ineligibility; and the certified list was unaffected by Pansy's participation in the oral evaluations. Moreover, as of February 1987, when Nevil was appointed patrolman, there is no competent evidence of an agreement to conspire, either explicit or implicit, and no evidence that any of the defendants acted in concert to deprive the plaintiffs of their constitutional rights.

▮ The plaintiffs insist that the conspiracy came to light when Officer John Baujan overheard the remark made by Mayor Gross to Chief Pansy which took place late 1989, or early 1990. As previously noted, he claims to have overheard Mayor Gross remarking to Pansy, "[i]t's too bad we could not do something for him, referring back to Kenny, because Kenny Nevil didn't pass the test either." *See document 41, p. 7, line 1, of the record.* Chief Pansy did not respond to the remark and Baujan was not a party to this exchange. It was not until two years later, in July of 1991, that Officer Baujan disclosed to plaintiff Richard Greene that he had overheard the discussion between Pansy and Gross, and the present lawsuit followed.

In evaluating the remark made by Gross to Pansy in context, it was purportedly made in reference to the 1987 written examination for patrolman inasmuch as those present had been informed that Health Williams had just failed the written portion of the 1989 examination. Even interpreting this remark in the light most favorable to the plaintiffs, it still does not support a conspiracy contention either alone or in combination with the other evidence of record. At most it could be interpreted as meaning that it was too bad that Gross and Pansy couldn't help Williams pass the written test because they helped Nevil when he did not pass. But, in fact, Nevil had passed the written test in 1987. Moreover, there is no competent evidence that a conspiracy ever existed prior to the remark by Gross and, therefore, it is not binding on the other defendants. Also, it is not sufficient to establish any conspiracy in itself. Pansy did not respond and the reference to "we" is not enough to identify and implicate the other defendants.[15] Despite being given every opportunity to develop the record further in order to give meaningful substance to this remark, the plaintiffs have failed to do so. As a result, it is this ambiguous, if not unfounded, comment by Mayor Gross, who played no part in the actual testing, and which is binding on no one else, that is relied upon by the plaintiffs as the principal evidence of a conspiratorial agreement to deprive them of their constitutional rights.

Nowhere in any document, affidavit, deposition testimony or other filings do the plaintiffs provide competent evidence that an agreement existed among the defendants, either explicitly or implicitly, to improperly assist Nevil in obtaining certification and, therefore, to deny plaintiffs their constitutional right to employment as patrolmen. The record reveals no evidence of concerted

---

new civil service test in 1987, as well as the general administration of the whole testing procedure, was not named as a defendant in this action. The only time he is mentioned by the plaintiffs throughout the pleadings, depositions, affidavits and other filings is when they attempt to describe, through his conduct, the existence of a conspiracy. The plaintiffs, however, fail to establish how the independent actions of Mr. Rodgers support their claim of a conspiracy. They do not assert that he entered into an agreement with any one of the defendants, nor do they even attempt to establish a motive for his participation in the conspiracy. There is no allegation nor is there supporting evidence that he was a member of a conspiracy. All of these factors are highly relevant in the context of this action as Mr. Rodgers was an integral part of the testing

process. He was the person who recommended that the certified list be updated, was in charge of posting the required public notices and generally was responsible for the administration of the overall testing process. Significantly, he was not only present during the oral evaluations of each candidate, he also tabulated the final scores of those candidates who participated in the written as well as oral exams.

15. Chester Gross and John Pansy both stated that they had no recollection of any conversation concerning an attempt to assist Kenneth Nevil in his pursuit of a position with the Stroudsburg Police Department. *See documents 39 and 40 of record.*

activity or attempts to implement a conspiratorial understanding. In sum, the facts and permissible inferences of record do not permit a finding that an actionable conspiracy existed among the defendants.

## II. Protected Property Interest

█] A common denominator to both plaintiffs' claims is that of a deprivation of a property interest in being hired as policemen in the borough of Stroudsburg. Greene, who was certified by the commission, and, therefore, placed on the list for consideration, but was not chosen in 1987, also claims he had a protected property interest in not having to compete against Kenneth Nevil. Both plaintiffs claim that because Nevil was favored by the defendants, and as such was not actually qualified to be on the list, his presence on the list constituted a violation of their civil rights. The court will address first the issue of whether the plaintiffs had a protected property interest in being denied eligibility for, and appointment to, the position of patrolman for the Borough of Stroudsburg. As set forth earlier in this memorandum, Greene's allegations are without merit.[16] Due to the scope of Schmidt's claims they will be addressed generally throughout this memorandum.

The United States Court of Appeals for the Third Circuit in *Anderson v. City of Philadelphia*, 845 F.2d 1216 (3rd Cir.1988), explained when a party has a constitutionally protected property right:

In *Roth*, the Court explained that [t]he Fourteenth Amendment's procedural protection of property is a safeguard of the security interests that a person has already acquired in specific benefits.... [T]o have a property interest in a benefit, a person must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

. . . .

Property interests ... are created and their dimensions are defined by existing rules and understandings that stem from an independent source such as state law—

rules or understandings that secure certain benefits and support claims of entitlement to those benefits.

*Id.* at 1220 (citing *Board of Regents v. Roth*, 408 U.S. 564, 576–77, 92 S.Ct. 2701, 2708–09, 33 L.Ed.2d 548 (1972)). In order to demonstrate a property interest, therefore, "the plaintiffs must show that under Pennsylvania law, they had a legitimate claim of entitlement to employment" as police officers. *Id.*

The facts before the court reveal that the plaintiffs can make no such claim of a protected property interest. The plaintiffs were nothing more than candidates for the position of patrolman. There is no state statute, regulation, written or unwritten state or local government policy or mutually explicit understanding between the government employer and employee, as required by law, *Stana v. School Dist. of the City of Pittsburgh,* 775 F.2d 122, 126 (3rd Cir.1985), that may have created a property interest for the plaintiffs. Further, the United States Supreme Court has stated that the purpose of procedural due process protection of a property interest is to protect those claims upon which people rely in their daily lives. *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). The plaintiffs were never employed by the Borough of Stroudsburg and have failed to demonstrate any reliance on their being hired as patrolmen. Although Mr. Greene actually was placed on the "certified list," as the plaintiffs were in *Anderson*, he was never anything more than a candidate or applicant for employment by the Borough of Stroudsburg, and as such was entitled to nothing more than *consideration* for employment when an opening occurred. *Anderson,* 845 F.2d at 1220. The court recognizes that Greene is contending that he should not be required to compete against Nevil because Nevil was placed on the list "illegally," as a result of the defendants' conspiracy, but this view of a protectible property interest is rejected. Moreover, the court has already concluded that a conspiracy never existed among the defendants to appoint Nevil over

**16.** *See infra* p. 647, and note 17 which discuss, in detail, why Greene's claims lack merit.

the others.[17]

Therefore, based on the record before the court, the plaintiffs' claims amount to nothing more than mere "abstract needs or desires," *Id.*, and they have failed to demonstrate that they have a legitimate claim of entitlement to the positions they sought. Consequently, they have no protected property interest.

### III. Post Deprivation Remedies

 Assuming, *arguendo*, that the defendants did engage in a conspiracy to deprive the plaintiffs of a constitutionally protected right and, also, that the plaintiffs had a protected interest in being considered for the position of patrolman, their § 1983 action would still not survive. It has been established that when a citizen has been deprived of property, by persons acting under color of state law, the focus of the court's inquiry then must be on whether the plaintiffs have suffered deprivations without due process of law. *Parratt v. Taylor*, 451 U.S. 527, 537, 101 S.Ct. 1908, 1914, 68 L.Ed.2d 420 (1981).

In *Parratt*, the Court made the distinction between cases where the injured party was deprived of his property interest without a predeprivation hearing when the deprivation was authorized by an established state procedure, from those cases where it was the "result of a random and unauthorized act by a state employee." *Id.* at 541, 101 S.Ct. at 1916. The Court found that where it was the result of an authorized state procedure, due process required predeprivation notice and a hearing in order to serve as a check on the possibility that a wrongful deprivation would occur. *Id.* at 538, 101 S.Ct. at 1914. It further held that when the deprivation is the result of a random and unauthorized act by some state employee, where the state cannot predict when such might occur and is, therefore, unable to provide a hearing prior to it taking place, procedural due process is satisfied if there is "available some meaningful means by which to assess the propriety of the State's action at some time after the initial taking." *Id.* at 539, 101 S.Ct. at 1915.

The holding in *Parratt* was expanded by the Court, three years later, in *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). In *Hudson*, the Court held that meaningful post-deprivation hearings satisfy procedural due process, even when the unauthorized acts of state employees are intentional. *Id.* at 533, 104 S.Ct. at 3203. Following the "underlying rationale" of *Parratt*, the *Hudson* Court stated,

> that when deprivations of property are effected through random and unauthorized conduct of a state employee, predeprivation procedures are simply "impracticable" *since the state cannot know when such deprivations will occur.* We can discern no logical distinction between negligent and intentional deprivations of property insofar as the 'practicability' of affording predeprivation process is concerned. *The state can no more anticipate and control in advance the random and unauthorized conduct of its employees than it can anticipate similar negligent conduct.*

*Id.* (emphasis added). The Court qualified that holding, as did the Court in *Parratt*, by

---

17. Even if the court assumes that the conspiracy in fact existed, Greene's argument still fails. The Borough of Stroudsburg's Police Civil Service Rules and Regulations, specifically § 803, which discusses the authority of Borough Council members to make selections from the certified list generated by the Civil Service Commissioners, reads, in pertinent part, as follows, "the council shall thereupon, with sole reference to the merits and fitness of the candidates, make appointments from the three names certified, . . . ." This language illustrates that the Council has discretion as to which candidates on the list they choose to hire. There is no requirement that the most highly rated individual be chosen and, in fact, any two of the three certified candidates may have been chosen. Greene argues that he had a right not to compete against Nevil on the certified list. In the case of *Burns v. Sullivan*, 619 F.2d 99 (1st Cir.1980), the court found that when a statute allows for discretion in those selected from a civil service list, as opposed to a statute or regulation which requires the candidates with the highest scores to be chosen, the candidate's expectations are "substantially diminished" and therefore "do not rise to the level of a property interest entitled to constitutional protection." *Id.* at 104 (*citing Bishop v. Wood*, 426 U.S. 341, 345 & n. 8, 96 S.Ct. 2074, 2077 & n. 8, 48 L.Ed.2d 684 (1976)). Greene's argument may have some merit if he could demonstrate that if Nevil were not on the list he would have been chosen for one of the two available positions, but because the council has the discretion to choose from any one of the *three* certified candidates for the available positions, Greene could not show that he would have been chosen over the other two candidates, regardless of who they were.

adding "intentional deprivations do not violate the [Due Process] Clause provided, of course, that adequate state post-deprivation remedies are available." *Id.* Certainly, a conspiracy, if one existed, would more properly fall under the definition of an intentional act by a state employee, rather than a negligent act. Further, there is no allegation by the plaintiffs that this deprivation of property occurred pursuant to an established state procedure. Accordingly, the facts of this case must be reviewed in light of *Hudson.*

Assuming the defendants acted in concert with one another to ensure that Kenneth Nevil was hired, the facts before the court fail to demonstrate how, in 1987, anyone, including the plaintiffs or the "state," could anticipate and control in advance the unauthorized, intentional conduct of the defendants, *viz.,* the conspiracy and, as a result, provide the plaintiffs with a meaningful pre-deprivation hearing. If the conspiracy existed, the defendants would most likely make every effort to conceal the illegal acts and, in doing so, make the need for a hearing virtually impossible to detect.[18] The *Hudson* court recognized that just such a scenario could take place and opined,

> Arguably, intentional acts are even more difficult to anticipate because one bent on intentionally depriving a person of his property might well take affirmative steps to avoid signaling his intent.

*Id.* Patently, it would have been impracticable, even impossible, to provide the plaintiffs with a predeprivation hearing given the alleged acts of the defendants based on the record presented to the court in this matter. But the analysis must not end here as *Hud-*

*son* requires that an adequate post-deprivation remedy must also be available.

Under Pennsylvania law, "[a]ny person aggrieved by the adjudication of a local agency who has a direct interest in such adjudication *shall* have the right to appeal therefrom to the court vested with jurisdiction of such appeals...." Local Agency Law, 2 Pa.Cons. Stat.Ann. § 752 (Purdon's Supp.1992) (emphasis added). That title, under § 101, defines an adjudication as, "[a]ny final order, decree, *decision* ... by an agency affecting personal or property rights." It further defines a government agency as "any political subdivision, or municipal or any other local authority." *Id.* (emphasis added). Clearly, the decision of the Council of the Borough of Stroudsburg to hire Kenneth Nevil, as well as its Civil Service Commission's method of evaluating those who are eligible for the position of patrolman, are decisions of local agencies from which the statutes of the Commonwealth Pennsylvania provide an avenue of appeal. Further, the plaintiffs had an additional remedy available to them under Pennsylvania law, in the form of a mandamus action. *McGrath v. Staisey,* 433 Pa. 8, 249 A.2d 280 (1969); *O'Neill v. Borough of Yardley,* 2 D. and C., 4th 236 (1989), *aff'd,* 129 Pa.Commw. 270, 565 A.2d 502 (1989), *appeal denied,* 526 Pa. 643, 584 A.2d 324 (1990).

It is not practicable or possible for a governmental entity to provide predeprivation procedural due process when the unauthorized intentional acts of a governmental entity result in such a deprivation, and because "[t]he Constitution does not require that which is impossible to provide," *Stana v. School District of the City of Pittsburgh,* 775 F.2d 122, 130, (3rd Cir.1985).[19] The court

---

**18.** The court is fully aware that the "state actors" in this matter are, or could be, not only those in policy and decision-making positions, but also those whose responsibility it is to implement their decisions. Here, for example, Mayor Gross and Chief Pansy may arguably be the "state actors" responsible for granting, or even implementing, a predeprivation hearing for the plaintiffs.

However, as stated earlier, the rationale of *Hudson* is still dispositive. Even if Chief Pansy and Mayor Gross were involved in a conspiracy to deprive the plaintiffs of the positions they sought, a predeprivation remedy would be impossible to implement as, "those bent on inten-

tionally depriving a person of his property right might well take affirmative steps to avoid signalling his intent." *Id.* 468 U.S. at 533, 104 S.Ct. at 3203–04. In other words, it defies logic to suggest that the very persons involved in the conspiracy to keep the plaintiffs from obtaining employment with the police department would then make available a predeprivation hearing for those who are the object of their conspiracy.

**19.** The court in not unaware of the following language in *Stana,*

> Patently, when the acts at issue were those of an official in a supervisory position, acting within the area of his authority, the govern-

finds that inasmuch as the plaintiffs were afforded two viable post-deprivation remedies, the appeal of the civil service's decision to the state court, Local Agency Law, 2 Pa.Cons.Stat.Ann. § 752 (Purdon's Supp. 1992), as well as a possible action in mandamus, a § 1983 action is inappropriate as there was no denial of procedural due process.

Therefore, the granting of summary judgment in favor of the defendants is appropriate even when the court assumes, *arguendo*, that the plaintiffs had a protected property interest and the defendants conspired to deprive the plaintiffs of that interest.

## IV. Conclusion

In sum, the court finds that no conspiracy existed among the defendants to deprive the plaintiffs of the positions as patrolmen with the Police Department of the Borough of Stroudsburg, Pennsylvania. Additionally, the plaintiffs had no protected property interest in the position they sought. Further, even assuming the presence of a property interest and the existence of a conspiracy, the availability in the Commonwealth of Pennsylvania of sufficient post-deprivation remedies precludes the plaintiffs from pursuing this § 1983 action in federal court. Accordingly, the defendants' motion for summary judgment will be granted.

---

mental entity was in a position to provide some predeprivation process.

*Id.* at 130. The facts of *Stana* are readily distinguishable from those of the instant action. The state actor in *Stana*, Allebrand, had checked with and had the approval of his superior to bypass Stana. Despite this information, no predeprivation hearing was afforded Stana.

Again, assuming *arguendo*, that a conspiracy existed, there was no information provided to any member of the Borough of Stroudsburg Government that a conspiracy existed to "fix" the 1987 exams. By the mere nature of a conspiracy, there would be no avenue for information to travel to the proper authorities, less a conspirator decided to admit to his illegal acts, which could result in the plaintiffs being provided predeprivation relief.