Robert N. BARBOUR, Petitioner

v.

MUNICIPAL POLICE OFFICERS'
EDUCATION AND TRAINING
COMMISSION, Respondent.

Brian Boyd, Jr., Petitioner

v.

Municipal Police Officers' Education
and Training Commission,
Respondent.

Ian C. Cleghorn, Petitioner

v.

Municipal Police Officers' Education
and Training Commission,
Respondent.

Kenneth F. Collins, Petitioner

v.

Municipal Police Officers' Education
and Training Commission,
Respondent.

Kevin M. Cosentino, Petitioner

v.

Municipal Police Officers' Education
and Training Commission,
Respondent.

Michael Curran, Petitioner

v.

Municipal Police Officers' Education
and Training Commission,
Respondent.

David M. Cuddhy, Petitioner

v.

Municipal Police Officers' Education
and Training Commission,
Respondent.

Daniel DiNardo, Petitioner

v.

Municipal Police Officers' Education
and Training Commission,

Respondent.

Francis S. Ely, Jr., Petitioner

v.

Municipal Police Officers' Education
and Training Commission,
Respondent.

Richard Fuller, Petitioner

v.

Municipal Police Officers' Education
and Training Commission,
Respondent.

Mark J. Heine, Petitioner

v.

Municipal Police Officers' Education
and Training Commission,
Respondent.

Michael K. Irey, Petitioner

v.

Municipal Police Officers' Education
and Training Commission,
Respondent.

Commonwealth Court of Pennsylvania.

Argued March 12, 2012.

Decided July 5, 2012.

S. Stanton Miller, Jr., Media, for petitioners.

Joanna N. Reynolds, Assistant Counsel, Harrisburg, for respondent.

BEFORE: LEADBETTER, Judge, and BROBSON, Judge, and OLER, JR., Senior Judge.

OPINION BY Judge LEADBETTER.

In these twelve related appeals, police officers employed by several municipalities in Delaware County (collectively, Petitioners) challenge the final orders of the Municipal Police Officers' Education and Training Commission (Commission) revoking their police officers' certifications for cheating on the annual mandatory in-service training course examinations. Petitioners argue that the Commission exceeded its authority under Section 2164 of the Act, commonly referred to as the Municipal Police Education and Training Act, *as amended,* 53 Pa.C.S. § 2164, in adopting the regulations which permit the Commission to revoke a police officer's certification for cheating. Petitioners further argue that the Commission's decisions were arbitrary and capricious and constituted an abuse of its discretion. We reject Petitioners' arguments and affirm the Commission's orders.[1]

I.

The Commission[2] is responsible for establishing a municipal police officers' education and training program, which is administered by the Pennsylvania State Police. Section 2161(a) of the Act, 53 Pa.C.S. § 2161(a). The Commission's powers and duties, enumerated by the Act, include the following:

> (1) To establish and administer the minimum courses of study for basic and in-service training for police officers and *to revoke an officer's certification when an officer fails to comply with the basic and in-service training requirements* [3] ] or is convicted of a criminal offense or the commission determines that the officer is physically or mentally unfit to perform the duties of his office.
>
> . . . .
>
> (6) To require every police officer to attend a minimum number of hours of

---

1. The Court denied Petitioners' unopposed application to consolidate the appeals but permitted them to file a single reproduced record and a single brief. The Court also permitted the Commission to file a single brief for these appeals and three other related appeals docketed at Nos. 612, 641 and 642 C.D. 2011. Because Petitioners, represented by the same counsel, raise the same legal issues, we will dispose of their appeals in this opinion for the sake of judicial economy. The petitioners in the three other related appeals are represented by different counsel. Those appeals will be considered in separate opinions. To the extent that Petitioners raise the same legal issues, the Court's discussion in *Hannigan v. Municipal Police Officers' Education and Training Commission* (Pa.Cmwlth. No. 612 C.D.2011, filed July 5, 2012), and *Freeman v. Municipal Police Officers' Education and Training Commission* (Pa.Cmwlth. No. 641 and 642 C.D.2011, filed July 5, 2012), memorandum opinions, equally applies to these appeals.

2. The Commission is composed of twenty members, including the Commissioner of the Pennsylvania State Police, the Secretary of Community and Economic Development, the Attorney General, and the appointees of the Governor, the President pro tempore of the Senate and the Speaker of the House of Representatives. Section 2163(a) of the Act, *as amended,* 53 Pa.C.S. § 2163(a).

3. The term "certification" is defined as "[t]he assignment of a certification number to a police officer after successful completion of a mandatory basic training course ... and successful completion of mandatory in-service training." Section 2162 of the Act, *as amended,* 53 Pa.C.S. § 2162. The certification is issued initially for two years and can be renewed every two years thereafter only for officers who have satisfied the mandatory in-service training requirements. *Id.;* 37 Pa. Code § 203.13(c). The Commission was granted the authority to revoke a police officer's certification in the 1988 amendment to the Act. *Saccol v. Mun. Police Officers' Educ. & Training Comm'n,* 149 Pa.Cmwlth. 343, 613 A.2d 122 (1992).

in-service training as provided for by regulation....

....

(14) To make such rules and regulations and to perform such other duties *as may be reasonably necessary or appropriate to implement the education and training program for police officers.*

Section 2164(1), (6) and (14) of the Act (emphasis and footnote added).

The regulations promulgated by the Commission require municipal police officers to comply with the annual mandatory in-service training requirements: (1) "[c]ontinuous" in-service requirements, consisting of annual qualifications on firearms and other weapons and maintenance of a first aid and CPR certification, and (2) "[a]cademic" in-service requirements, consisting of at least 12 hours of annual academic training requirements. 37 Pa.Code § 203.52(b)(1) and (2). Successful completion of the annual academic in-service requirements is determined only by examinations provided by the Commission and administered by course instructors at the end of each training course. 37 Pa.Code § 203.52(c)(6). A police officer who fails to receive a minimum passing score determined by the Commission is given an opportunity to review the course and take an oral reexamination with different questions. 37 Pa.Code § 203.52(c)(7). An individual who is currently employed as a police officer and fails both the initial examination and the reexamination is permitted to participate in another course offering and examinations. *Id.*

The Commission also adopted a policy on cheating in 37 Pa.Code § 203.54(a), which provides:

The contents of all examinations are confidential. An individual may not cheat or tamper in any manner with an official examination either conducted or sponsored by the Commission by obtaining, furnishing, accepting, or attempting to obtain, furnish or accept answers or questions to examinations, or portions thereof. Individuals may not copy, photograph or otherwise remove examination contents; nor may they use any misrepresentation or dishonest method while preparing, administering or participating in examinations. Unauthorized possession of a test, examination, quiz or ... questions, answers or answer keys relating to a test, examination or quiz shall constitute cheating. *An individual violating this section shall be barred from further participation in any Commission-required training and ineligible for certification.* Individuals will receive notice and have an opportunity to be heard under Subchapter G (relating to notice and hearings). [Emphasis added.]

The Commission "maintains the right to revoke certification after notice and an opportunity to be heard" for, *inter alia,* "[f]ailure to successfully complete annual mandatory in-service training" and "[c]heating." 37 Pa.Code § 203.14(a)(4) and (9).

## II.

In separate letters dated June 30, 2009, the Commission's executive director, John M. Gallaher, informed Petitioners and the three other officers involved in the related appeals, Timothy Hannigan, Jonathan Freeman and Sean P. Gallagher, that he was proposing to revoke their police officers' certifications for cause and that they had a right to request a hearing within 15 days. Gallaher stated that he possessed facts which led him to believe that they (1) failed to successfully complete the 2009 mandatory academic in-service training requirements and (2) cheated during the academic training course examinations by possessing and/or furnishing answers to

the examinations. The Commission thereafter appointed a hearing officer who held hearings on the proposed revocations on November 2, 4 and 12 and December 4 and 10, 2009. After the hearings, the hearing officer granted the Commission's motion to adopt a master record, consisting of the testimony of the Commission's witnesses presented at the November 2, 2009 hearing for Petitioner Irey and its exhibits M–1 through M–31, which would be considered in all of the 15 related cases. The hearing officer also permitted the Commission to supplement the record to include copies of Gallaher's June 30, 2009 letters (Exhibits M–32 through M–46).

The evidence presented by the Commission reveals the following circumstances leading to the cheating allegations against Petitioners. The Commission prepares three versions of examinations for each academic in-service training course: (1) Test 1, also referred to and interchangeable with Test A, to be administered following each training course; (2) Test 2 or Test B, a retest for officers who fail Test 1; and (3) Test 3 or Test C, to be administered to officers who fail both Test 1 and Test 2 and must re-take the course. Before scheduled examinations, the Commission sends twenty-one police academies a compact disc containing three versions of tests and answer keys. The police academy directors then reproduce hard copies of the tests and answer keys from the compact disc. Each test consists of ten multiple-choice questions with a possible answer of A, B, C or D for each question. Jamie Vaughn, an office assistant at the police academy at the Delaware County Community College (Delaware County police academy), testified that she usually labeled each test as Test 1, 2 and 3 or Test A, B and C, depending on how the Commission labeled it, inserted page numbers on top of each test page and gave course instructors approximately 35 copies of Test 1 and 10

copies of Test 2 for each training course examination.

Before administering an examination, a course instructor must inform the class of the Commission's cheating policy as stated in 37 Pa.Code § 203.54(a). 37 Pa.Code § 203.54(c). The cheating policy is also printed verbatim on top of the answer sheet above the officer's signature line. The officers sign and print their names and fill in the name of a police academy and a test version, as directed by the instructors: Test 1 or Test A for an initial test and Test 2 or Test B for a retest. The officers also fill in the class ID, the session ID, the course title and the course/test date. After completion of the tests, the officers turn in the tests and the answer sheets separately. The tests used by the officers cannot be identified because they are not attached to the answer sheets and do not contain any information linking the tests to test takers.

In 2009, Petitioners were required to take four three-hour annual mandatory academic in-service training courses. The Commission shipped the training course test materials to the police academies by UPS in late December 2008 for examinations scheduled for February 25 and 26, 2009. On February 5, 2009, Officer Gallagher of the Oxford Borough police department, the petitioner in No. 642 C.D.2011, sent Officers Brian Dever and Joseph Devlin of the same police department an e-mail with the subject line, "FW: Answers for Act 180 if you need them," and listing answers to the four 2009 academic training course examinations. Exhibits M–12 and M–13; Master Reproduced Record (R.R.) at 159a and 160a. The e-mail did not indicate whether those answers were for Test 1 or Test 2. Dever and Devlin forwarded Gallagher's e-mail to their police chief, who in turn reported the e-mail to the director of the Delaware County police

academy, William Davis. Davis then notified the Commission's administrative officer, Beverly Young, that the Test 1 answers had been disseminated via an email.

On February 12, 2009, Young and the Commission's director of training, Rudy M. Grubesky, instructed police officers' education training specialists, Timothy Ebersole and Kimberly Shaw, to investigate the cheating allegations. On February 24, 2009, Grubesky sent an e-mail to the police academy directors, stating:

> **Due to a recent cheating incident, the examinations for Test 1 (Test A) for all four 2009 Mandatory In–Service Training Program courses have been compromised. Please discontinue using Test 1(A) as soon as practicable.** I know there may be some logistical issues and hardship in making this change, but we need to ensure the integrity of the examinations. Please keep monitoring test security at your school. The investigation is ongoing.

Exhibit M–4; R.R. at 150a (emphasis in original). Before receiving Grubesky's email, the Delaware County police academy director had already instructed his secretary, Vaughn, to destroy the Test 1 materials and give the course instructors Test 2 and Test 3 versions instead. Vaughn shredded all of the Test 1 materials, as instructed.

On February 25, 2009, the course instructor, John W. Ryan, was scheduled to teach two three-hour courses at the Delaware County police academy: Legal Updates in the morning and Officer Safety Awareness in the afternoon. His usual procedure was to administer an examination for the morning class before lunch. On that date, however, Ryan realized that he did not have enough test materials for the Legal Updates course. Because he could not quickly obtain additional test materials, he released the officers for a lunch break, stating that they would take the Legal Updates test after lunch. In handing out the Legal Updates tests to the class after lunch, he noticed that they were Test 2 or Test B versions. During the subsequent Officer Safety Awareness test, someone in the class asked him to verify the test number. After responding that it was Test 2 or Test B, he checked to make sure that he was handing out Test 2 versions. In the classroom, only he had a copy of the Test 1 version for the Officer Safety Awareness course, which he had used to take the test himself to prepare for the class. In the eighteen years that he had been a course instructor, it was the first time that he gave the class Test 2 versions for an initial test.

In grading the Office Safety Awareness test, Ryan realized that he had never had so many officers failing the test. He checked again to make sure that all of the test booklets were the same. He took the Officer Safety Awareness tests and answer sheets home and went over the officers' answers again. He made slash marks on correct answers whenever the officers placed wrong answers on the answer sheet. After reviewing the answers of the officers who failed to receive a passing grade of 70%, he learned that they seemed to have the same wrong answers on the test and that most of them would have received 90% or 100% on the Test 1 version. The next day, he informed the Delaware County police academy director of his findings and administered the Test 3 versions to the officers who failed the first test. The Commission's investigators, Ebersole and Shaw, thereafter analyzed Petitioners' answers by comparing them with the answers disseminated before the examinations.

### III.

In the separate proposed decisions issued on November 2, 2010, the hearing

officer reviewed the evidence presented by the Commission and each Petitioner regarding the cheating allegations and made her recommendations to the Commission.

### 1. *Barbour.*

Barbour was employed by the Borough of Darby as a canine officer. The investigators, Ebersole and Shaw, determined that the Delaware County police academy used the Test 2 versions of the Officer Safety Awareness test on February 25, 2009. Although Barbour scored a passing score of 70% on the Legal Update test and also passed the Officer Safety Awareness test, the investigators decided to interview him because they noticed on his answer sheet eight suspicious erasure marks or tick marks where correct answers to the compromised Test 1 version would have been. During the interview, Barbour admitted that before the Legal Update test, he received a text-message containing the answers to all four course examinations from Officer Hannigan of the Borough of Darby police department, the petitioner in No. 612 C.D.2011. Barbour initially claimed that he deleted Hannigan's text-message and did not place any marks on his answer sheet. After a private conversation with his police chief who attended the interview, he admitted that he wrote down the answers contained in Hannigan's text-message on the note pad, placed marks on those answers on the answer sheet, and then erased those marks after reading the questions.

At the hearing, Barbour testified that he deleted Hannigan's text-message, believing that it was a practical joke. He also denied making any marks on his answer sheet. When asked why he changed his story during the interview with the investigators, he replied: "[I]t basically came down to, you know, respect my chief. He didn't believe me.... [H]e almost made me feel like, listen tell them what they want to hear and we'll work this out and it will be worked out. And I gave in to that. It was the easy out. That's what I did." November 4, 2009 Hearing, Notes of Testimony (N.T.) at 49; R.R. at 221a. Lieutenant Richard Gibney of the Borough of Darby police department testified that Barbour told him that Barbour admitted cheating to the investigators because of the police chief's threat. The police chief testified that he privately talked to Barbour and was "in [Barbour's] face" because he felt that Barbour was not "forthright" in answering the investigators' questions. *Id.* at 32; R.R. at 217a. The police chief further testified that he had no problem in keeping Barbour in his police department and that losing Barbour and Petitioner Cuddhy would cause a major problem to his department.

Accepting the Commission's evidence as credible and rejecting Barbour's testimony, the hearing officer found that the police chief simply told Barbour to tell the truth and did not coerce him to confess what he did not do. The hearing officer found that Barbour had access to the Test 1 answers, marked them on the answer sheet and then erased them. The hearing officer concluded that the Commission met the burden of proving cause to revoke Barbour's certification for cheating. She noted that 37 Pa.Code § 203.54(a) was broadly written and did not provide for any exception to a revocation based on an officer's prior employment record or extenuating or mitigating circumstances. She stated that if the Commission had discretion to do so, Barbour's performance as a police officer could be considered in determining the possibility of a future re-certification.

### 2. *Boyd.*

Boyd was a patrol officer for Upland Borough. The analysis of Boyd's answer

sheet showed that he scored 40% on the Officer Safety Awareness test but would have received 90% on the Test 1 version. Exhibits M–2 and M–28; R.R. at 130a and 175a. Boyd and five other Petitioners (Curran, DiNardo, Ely, Fuller and Irey) had identical answers to the Officer Safety Awareness test with the same wrong answer to Question # 9 of the Test 1 version. The investigators determined that Boyd violated the cheating policy by possessing the test answers. He agreed to submit to a polygraph test, but the Commission did not arrange one.

At the hearing, Boyd denied having access to the test answers or otherwise cheating on the test. He testified that he wrote A for the version of the Officer Safety Awareness test at the instructor's direction and placed on the answer sheet what he believed to be correct answers. He agreed that his answers were identical to the answers of Petitioner DiNardo, who sat next to him during the test and admitted having access to the test answers. The Borough's police chief and mayor and the Borough council president testified that they did not question Boyd's integrity, honesty and professionalism and that losing Boyd, Curran and DiNardo from the police department with only four full-time police officers would create a public safety issue. They conceded that neighboring municipalities would provide support for the Borough, if necessary, under the mutual aid agreement.

The hearing officer found the testimony of the Commission's witnesses credible and rejected Boyd's assertion that he and other officers were given the Test 1 version of the test. The hearing officer stated that the credibility of the course instructor's testimony was not undermined by his admission that he made a mistake in evaluating the answers of Irey, who had the same answers as Boyd, as 100%, not 90%, for the Test 1 version. She suggested that the Commission consider the testimony of Boyd's witnesses regarding his performance as a police officer and the hardship that the Borough would experience upon Boyd's decertification for a possible future recertification, if it had discretion to do so.

### 3. Cleghorn.

Cleghorn was employed by the Borough of Ridley Park as a patrol officer. Ebersole and Shaw interviewed him because he failed the Officer's Safety Awareness test and was on the distribution list of the e-mail that disseminated the test answers. Cleghorn provided Ebersole a copy of the e-mail containing the test answers, which Officer Freeman of the Trainer Borough police department, the petitioner in No. 641 C.D.2011, forwarded to him. Exhibit M–24; R.R. at 171a. The e-mail forwarded by Freeman to Cleghorn and other officers was from *blaze52@comcast.net*, identified by Freeman at the hearing as Officer Richard Griffin's e-mail address. During the investigation, Cleghorn initially denied but later admitted using the answers contained in Freeman's e-mail during the test. The analysis of his answers to the Officer Safety Awareness test showed that he scored 60% on the Test 2 version but would have received a passing score of 70% on the compromised Test 1 version. Exhibits M–2 and M–25; R.R. at 131 a and 172a.

Cleghorn testified that he thought that Freeman's e-mail was a joke and that the e-mail ended up in his computer's trash bin when he attempted to delete it. He admitted that he had the test answers contained in Freeman's e-mail in his "workbook" during the test and compared them to see if they were actually valid answers. November 12, 2009 Hearing, N.T. at 31; R.R. at 311a. He stated that possessing Freeman's e-mail during the

test was "the stupidest thing" he had done in his career as a police officer. *Id.* at 38; R.R. at 318a. The Borough's police chief testified that upon Cleghorn's decertification, his police department with eight full-time officers would have either only one officer working in one shift or have to pay another officer overtime pay. The police chief did not question Cleghorn's integrity and honesty.

Accepting the testimony of the Commission's witnesses as credible and rejecting Cleghorn's claim that he took the Test 1 version, the hearing officer concluded that his admitted possession and use of the answers in Freeman's e-mail constituted cheating. She stated that the Commission may elect to consider Cleghorn's performance as a police officer for a possible future recertification, if it had discretion to do so.

### 4. *Collins.*

Collins was a part-time police officer for the Borough of Darby and the Borough of Millbourne. He scored a failing grade of 40% on the Test 2 version of the Office Safety Awareness test but would have received 100% on the Test 1 version. Exhibits M–2 and M–21; R.R. at 132a and 168a. During the interview with the investigators, Collins denied that he possessed the answers before or during the test or otherwise cheated on the test. At the hearing, Collins again denied cheating and testified that he believed he was given the Test 1 version of the Officer Safety Awareness test. The Boroughs' police chiefs testified regarding Collins's integrity and honesty and the hardship that the Boroughs would experience upon his decertification.

The hearing officer accepted the Commission's evidence as credible and rejected Collins's claim that he took the Test 1 version of the Office Safety Awareness test. She concluded that the Commission

established that the Test 2 version was administered to Collins and that he possessed the answers to the Test 1 version and used them during the test. She suggested the Commission's consideration of his performance as a police officer for a possible recertification, if it had discretion to do so.

### 5. *Cosentino.*

Cosentino was a full-time patrol officer for Upper Darby Township. There was no direct evidence that Cosentino received an e-mail or a text message containing the test answers. He received a failing grade of 40% on the Test 2 version of Officer Safety Awareness test but would have scored 100% on the Test 1 version. Exhibits M–2 and M–30; R.R. at 133a and 177a. His answers were identical to the answers of Collins who sat next to him during the test. He denied cheating to the investigators. At the hearing, he again denied having access to the test answers or otherwise cheating on the test. Cosentino's supervisor testified that he had no reason to seek Cosentino's removal from the police force despite the cheating allegations against him. The hearing officer rejected Cosentino's assertion that he was inadvertently given the Test 1 version. She accepted the course instructor's testimony that all of the test booklets he collected after the test were the Test 2 versions. She suggested the Commission's consideration of his performance as a police officer for a possible recertification, if it was permitted to do so.

### 6. *Curran.*

Curran was a detective for the Upland Borough police department. He received 40% on the Officer Safety Awareness test but would have received 90% on the Test 1 version. Exhibits M–2 and M–27; R.R. 135a and 174a. Curran's answers were

identical to the answers of five other Petitioners with the same wrong answer to Question # 9 of the Test 1 version. Based on the analysis of his answers, the investigators concluded that he had access to the Officer Safety Awareness test answers. Curran denied having access to the test answers and otherwise cheating on the test. The Borough's police chief and mayor and the Borough council president testified that losing 3 out of the 4 full-time police officers (Curran, Boyd and DiNardo) would create a public safety issue and that they did not question Curran's integrity, honesty and professionalism. The hearing officer accepted the testimony of the Commission's witnesses and rejected Curran's claim that he actually took the Test 1 version ·of the test. The hearing officer concluded that the Commission met the burden of establishing cause to revoke Curran's certification for cheating. She suggested the Commission's consideration of his evidence of mitigating circumstances for a possible recertification.

### 7. *Cuddhy.*

Cuddhy was a patrol officer for the Borough of Darby. Cuddhy received 70% on the Legal Updates test and would have received 100% on the Test 2 version. Exhibit M–19; R.R. at 166a. During the Commission's investigation, Cuddhy stated that before the Legal Updates test, he received from Hannigan a text-message containing the answers to the four training course tests. He initially denied using those answers during the test. The investigator, Ebersole, then showed him his answer sheet for the Legal Updates test with what appeared to be eraser marks on correct answers to the Test 1 version questions. Cuddhy then admitted that he possessed the Legal Updates test answers during the test, marked them on the answer sheet and erased them after reading the questions. Ebersole noted that Cud-

dhy's cooperation was valuable to the investigation.

At the hearing, Cuddhy testified that before the Legal Updates test, Hannigan sent him the text-message containing the answers for the four training courses. Cuddhy admitted that he made smudge marks on the answer sheet. He testified:

> We received the answers. I put the answer down on the [answer] sheet, and I realized that the decision I was making could possibly get me fired. I did sign a sheet that said I was not supposed to cheat. I erased the answers and I took the test and I received a 70.

November 4, 2009 Hearing, N.T. at 40; R.R. at 470a. He further testified that he committed an error in judgment and "allowed [himself] to be stupid enough to take the answers and write them down on the test." *Id.* at 42; R.R. at 471a. The Borough's police chief testified that Cuddhy's actions were inappropriate and that decertification of Cuddhy and Barbour would cause a major problem to his police department.

The hearing officer concluded that the Commission established cause to revoke Cuddhy's certification. She suggested the Commission's consideration of Cuddhy's cooperation in the investigation and his performance as a police officer in determining the possibility of his recertification, if it had discretion to do so.

### 8. *DiNardo.*

DiNardo was a patrol officer for the Upland Borough police department. There was no direct evidence that he received an e-mail containing the test answers. He scored a failing grade of 40% on the Officer Safety Awareness test. Exhibit M–2; R.R. at 136a. His nine answers matched the compromised Test 1 answers with the wrong answer to Ques-

tion # 9. Exhibit M–29; R.R. at 176a. During the first interview with the investigators, he could not explain why his answers substantially matched the Test 1 answers. During the second interview, he admitted that he copied answers to the Legal Updates test that Hannigan wrote down on the answer sheet before lunch and that he later looked over the answers of Hannigan who sat next to him with an empty seat between them. DiNardo told the investigators that the test was hard and that he was "a bad test taker." December 4, 2009 Hearing, N.T. at 14; R.R. at 496a.

At the hearing, DiNardo admitted that he looked over the answer sheet that Hannigan was holding. DiNardo testified that he did not change his answers after comparing them to Hannigan's. He failed a retest on Officer Safety Awareness, took the course again and passed the third test. The Borough's chief of police and mayor and the president of the Borough council testified as to DiNardo's integrity and honesty, the hardship that the Borough would experience upon his decertification, and their public safety concerns.

The hearing officer noted inconsistency in DiNardo's testimony as to when he looked over Hannigan's answer sheet. She also noted that DiNardo's answers to the Officer Safety Awareness test matched five other Petitioners with the same wrong answer to Question # 9 of the Test 1 version and that his first seven answers also matched Hannigan's answers. The hearing officer rejected DiNardo's claim that he was given the Test 1 version and that he did not change his answers after looking over Hannigan's openly displayed answers. She concluded that the Commission established that the Test 2 version was administered for the Officer Safety Awareness test. Finding that DiNardo possessed and used the answers to the compromised Test 1 version, the hearing officer recommended a revocation of his certification and suggested consideration of his witnesses' testimony for a possible recertification, if the Commission had discretion to do so.

9. *Ely.*

Ely was a patrol officer for the Borough of Brookhaven. He received a failing grade of 40% on the Test 2 version of the Officer Safety Awareness test but would have received 90% on the Test 1 version with the same wrong answer to Question # 9, as five other Petitioners. Exhibits M–2 and M–23; R.R. at 137a and 170a. During the interview, he denied having access to the test answers or otherwise cheating on the test. Because 9 of Ely's 10 answers matched the correct answers to the compromised Test 1 version, the investigators concluded that he had access to the answers before the test. At the hearing, he again denied that he had access to the test or otherwise cheated on the test. His police chief testified that it would be hard to replace him because he performed many tasks for the police department. The police chief did not question Ely's truthfulness and integrity and would continue to employ him.

The hearing officer rejected Ely's assertion that he was given the Test 1 version of the Officer Safety Awareness test. The hearing officer also rejected his challenge to the credibility of the course instructor's testimony based on the instructor's mistake in grading his answers to the Test 1 version as 100%, not 90%. The hearing officer determined that the Commission established cause to revoke Ely's certification for cheating. She suggested consideration of Ely's performance as a police officer for a possible recertification, if the Commission had discretion to do so.

10. *Fuller.*

Fuller was a patrol officer for the Borough of Brookhaven for 40 years. The analysis of Fuller's answers to the Officer Safety Awareness test showed that he received 40% but would have received 90% on the Test 1 version with the same wrong answer to Question # 9, as five other Petitioners. Exhibits M–2 and M–22; R.R. at 138a and 169a. During the interview with the investigators, he denied receiving an e-mail with the test answers, but he admitted that he overheard officers in the classroom discussing answers and used four or five of those answers during the test.

At the hearing, Fuller denied that he had access to the test answers. He testified that he was sick on the day of the test and upset because a police officer, who was his best friend, had recently committed suicide, and that the segment of the Officer Safety Awareness test on suicide impacted him. He admitted that he overheard several people in the classroom "calling out or stating" answers to certain questions. November 12, 2009 Hearing, N.T. at 33; R.R. at 623a. When asked if he used some of the overheard information to answer the test questions, he testified: "I looked down and saw the letter, and it appeared to be the right answer, and I used that letter." *Id.* at 34; R.R. at 624a. The Borough's police chief testified that decertification of Fuller, who was one of eight full-time officers and performed many tasks, would be detrimental to the operation of his police department.

The hearing officer concluded that the Commission established cause to revoke Fuller's certification for cheating. She also noted that Fuller had been a police officer for 40 years, was truthful throughout the proceeding and may have been impacted by the fellow officer's suicide. She suggested consideration of those factors for a possible recertification, if the Commission had discretion to do so.

11. *Heine.*

Heine was employed by Ridley Township as a full-time patrol officer. He scored 40% on the Officer Safety Awareness test but would have received 100% on the Test 1 version. Exhibits M–2 and M–31; R.R. at 140a and 178a. He denied possessing the test answers or otherwise cheating on the test. Because all of his answers to the Officer Safety Awareness test matched the correct answers to the compromised Test 1 version, the investigators concluded that he had access to the answers and used them during the test. At the hearing, Heine denied having access to the test answers and using them during the test. The captain of the Ridley Township police department testified that Heine's continued employment presented no problem despite the cheating allegations against him. Accepting the Commission's evidence as credible and rejecting Heine's claim that he was given the Test 1 version, the hearing officer concluded that the Commission had cause to revoke his certification. She suggested the Commission's consideration of his performance as a police officer for a possible recertification, if the Commission had discretion to do so.

12. *Irey.*

Irey was a detective for Nether Providence Township. Irey received 40% on the Officer Safety Awareness test but would have received 90% on the Test 1 version. Exhibits M–2 and M–10; R.R. at 141 a and 158a. His answers were identical to five other Petitioners who failed the test, with the same wrong answer to Question # 9 of the Test 1 version. During the investigation, he denied possessing or otherwise cheating on the test. Because 9 out

of the 10 answers were identical to the correct answers to the compromised Test 1 version and to the answers of the 11 officers who were being investigated, the investigators concluded that he had access to the test answers.

Irey testified that the course instructor distributed the tests to the class by counting the number of individuals sitting in each row of seats and handing out the tests to an individual seating at the end of each row, who passed the tests down the row. Irey again denied receiving the test answers or otherwise cheating on the test. Two criminal defense attorneys, who had interactions with Irey, and Irey's fellow officer testified that Irey had a reputation of being objective, truthful and professional. The Township's police chief testified that he did not question Irey's honesty and integrity despite the cheating allegations against him.

The hearing officer accepted the Commission's evidence as credible and rejected Irey's contention that he actually took the Test 1 version of the Officer's Safety Awareness test. She found that the Test 1 versions were shredded before the test and that the Test 2 versions were distributed to the class. She concluded that the Commission had cause to revoke Irey's certification. She suggested that the testimony of his witnesses may support a less severe sanction or a possible recertification, if the Commission had discretion to do so.

On November 4, 2010, the Commission notified Petitioners that exceptions to the hearing officer's proposed decisions should be filed pursuant to 1 Pa.Code § 35.211 no later than December 8, 2010. In the separate exceptions, Petitioners challenged the hearing officer's findings that the Commission had cause to revoke their certifications. They also challenged the hearing officer's credibility determinations in favor of the Commission's witnesses. They argued that the Commission failed to produce the original test booklets distributed in the classroom to establish that they took the Test 2 version of the test. On March 10, 2011, the Commission issued 15 final orders, adopting verbatim the hearing officer's proposed findings of fact and conclusions of law, including her conclusion that the evidence did not support the proposed revocations of certifications for failure to successfully complete the 2009 mandatory in-service training program. The Commission revoked the certifications of Petitioners and the officers involved in the three related appeals for cheating. Petitioners' appeals to this Court followed.[4]

## IV.

Petitioners argue that the Commission lacked authority to revoke their certifications for cheating under Section 2164(1) of the Act and that 37 Pa.Code §§ 203.14(9) and 203.54(a) are unreasonable because those provisions fail to allow a less severe sanction for cheating, such as a suspension, and fail to provide for recertification procedures for decertified officers. Petitioners assert that the regulations are inherently unreasonable because they authorize decertification of a police officer for cheating, but not for conviction of a misdemeanor of the third degree.[5] Petitioners

---

4. An administrative agency's decision must be affirmed, unless it violated a constitutional right, it was not in accordance with law, or any necessary findings of fact made by the agency are not supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704; *D'Alessandro v.*

*Pa. State Police,* 594 Pa. 500, 937 A.2d 404 (2007).

5. A police officer's certification may be revoked for conviction of "a disqualifying criminal offense," which is defined as "[a] criminal offense for which more than 1 year in prison

further argue that the Commission's decisions were arbitrary and unreasonable and constituted an error of law and abuse of discretion due to its failure to consider their mitigating or extenuating circumstances.[6]

The Act delegates to the Commission the broad legislative authority to make rules and regulations, which "may be reasonably necessary or appropriate to implement the education and training program." Section 2164(14). Where, as here, the statute specifically delegates the authority to adopt rules and regulations necessary to administer a statute, the regulations adopted by the agency pursuant to such delegated authority "establish new law, rights or duties." *Borough of Pottstown v. Pa. Mun. Ret. Bd.*, 551 Pa. 605, 609, 712 A.2d 741, 743 (1998). They have the force of law and are binding on reviewing courts as part of a statute, as long as they are (1) within the granted power, (2) adopted in compliance with proper procedures and (3) reasonable. *Tire Jockey Serv. Inc. v.*

*Dep't of Envtl. Prot.*, 591 Pa. 73, 915 A.2d 1165 (2007).[7]

■ To establish that an agency has exceeded its legislative rule-making powers, the regulations must appear to be so entirely at odds with fundamental principles as to be the expression of a whim, rather than an exercise of judgment. *Bayada Nurses, Inc. v. Dep't of Labor & Indus.*, 958 A.2d 1050 (Pa.Cmwlth.2008), *aff'd*, 607 Pa. 527, 8 A.3d 866 (2010). The Act imposes the responsibility for establishing and administering the academic training program upon the Commission and requires every municipal police officer to attend a minimum number of hours of in-service training as required by the regulations. Section 2164(1) and (6). As part of the implementation of the training program, the Commission adopted the policy, prohibiting an individual from cheating by obtaining, furnishing or accepting answers to the training course examinations and imposing punishments for violating that policy. The adoption of such policy is well within the Commission's broad and ex-

---

can be imposed as punishment." 37 Pa.Code §§ 203.14(a)(6) and 203.1. Under Section 1104(3) of the Crimes Code, 18 Pa.C.S. § 1104(3), a person convicted of a misdemeanor of the third degree may be sentenced to not more than one year in imprisonment.

6. Petitioners also argue that the revocations of their certifications violated their constitutional rights to due process and equal protection. Petitioners, however, failed to raise the issue before the hearing officer or in the exceptions to her decisions filed with the Commission. To preserve an issue, a party must raise it at every stage of the proceeding. *Nabisco Brands, Inc. v. Workers' Comp. Appeal Bd. (Tropello)*, 763 A.2d 555 (Pa.Cmwlth. 2000). Where, as here, an issue was not raised in exceptions to a hearing officer's decision, it has been waived. *K.J. v. Pa. Dep't of Pub. Welfare*, 767 A.2d 609 (Pa.Cmwlth. 2001). This includes a challenge to the validity of a regulation (as opposed to a challenge to the facial validity of a statute). *Moran v. Unemployment Comp. Bd. of Review*, 973 A.2d

1024 (Pa.Cmwlth.2009); DARLINGTON, PENNSYLVANIA APPELLATE PRACTICE (2011–2012) § 1551:4.

7. Even where a statute directs an agency to operate under the statute but does not explicitly provide the agency with rulemaking powers, the agency may adopt rules and regulations necessary for administration of the statute "based on its interpretation of the statute." *Bailey v. Zoning Bd. of Adjustment of Phila.*, 569 Pa. 147, 161, 801 A.2d 492, 501 (2002). The agency's regulations adopted pursuant to the legislative rulemaking powers must be distinguished from regulations adopted pursuant to the interpretative rulemaking powers. *Bayada Nurses, Inc. v. Dep't of Labor & Indus.*, 958 A.2d 1050 (Pa. Cmwlth.2008), *aff'd*, 607 Pa. 527, 8 A.3d 866 (2010). Unlike the former, the interpretative regulations merely construe a statute and do not expand upon its terms; they are deferred to by the court only if they are reasonable and genuinely track the meaning of the underlying statute. *Id.*

press legislative rulemaking powers to promulgate regulations implementing the academic training program.

■ The regulations adopted under the legislative rulemaking powers "enjoy a general presumption of reasonableness." *Borough of Pottstown*, 551 Pa. at 610, 712 A.2d at 743.[8] In evaluating the reasonableness of the regulations, "appellate courts accord deference to agencies and reverse agency determinations only if they were made in bad faith or if they constituted a manifest or flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions." *Rohrbaugh v. Pa. Pub. Util. Comm'n*, 556 Pa. 199, 208, 727 A.2d 1080, 1085 (1999).

This Court has repeatedly and consistently held law enforcement officers to "high standards of conduct." *McFadden v. Pa. State Police*, 115 Pa.Cmwlth. 635, 540 A.2d 1009, 1012 (1988). As this Court stated in *Cerceo v. Borough of Darby*, 3 Pa.Cmwlth. 174, 281 A.2d 251, 255 (1971):

> The police officer[ ] is expected to conduct himself lawfully and properly to bring honor and respect to the law which he is sworn and duty-bound to uphold. He who fails to so comport brings upon the law grave shadows of public distrust. We demand from our law enforcement officers, and properly so, adherence to demanding standards which are higher than those applied to many other professions. It is a standard which demands more than a forbearance from overt and indictable illegal conduct. It demands that in both an officer's private and official lives he do nothing to bring dishonor upon his noble calling and in no way contribute to a weakening of the public confidence and trust of which he is a repository.

In order to maintain the integrity of police forces and the public confidence, the Commission determined that police officers cheating on a training course examination commit a serious breach of their high standards of conduct and should not remain certified. The Commission's determination is not arbitrary, nor is it made in bad faith.

■ The fact that the regulations do not provide for a less severe punishment and do not allow consideration of mitigating circumstances is not a basis for invalidating the regulations as unreasonable. In reviewing the regulations, "[i]t is *not* our function to decide what we would have done under the circumstances if we had been" in the Commission's position. *Appeal of Zimmett*, 28 Pa.Cmwlth. 103, 367 A.2d 382, 383 (1977) (emphasis in original). A court "is not at liberty to substitute its own discretion for that of administrative officers who have kept within the bounds of their administrative powers." *Rohrbaugh*, 556 Pa. at 208, 727 A.2d at 1085. Consequently, the Court may not interfere with the Commission's determination that an appropriate punishment for violating its policy was decertification. *See also McFadden* (holding that the Pennsylvania State Police did not abuse its discretion in terminating a state police officer's employment for illegal drug use without considering mitigating circumstances); *Miller v. City of York*, 52 Pa.Cmwlth. 483, 415 A.2d 1280 (1980) (holding that the extent of punishments imposed upon a police officer who violated police regulations is for the city council to decide and may not be interfered with by the court, absent a flagrant abuse of discretion).

---

8. Petitioners do not dispute that the Commission's regulations were adopted in compliance with the procedural requirements.

## V.

In this proceeding, the Commission had the burden of establishing cause for revoking Petitioners' certifications by a preponderance of the evidence. *Suber v. Pa. Comm'n on Crime & Delinquency,* 885 A.2d 678 (Pa.Cmwlth.2005); *Samuel J. Lansberry, Inc. v. Pa. Pub. Utility Comm'n,* 134 Pa.Cmwlth. 218, 578 A.2d 600 (1990). A preponderance of the evidence is such evidence as leads a fact-finder to find a contested fact to be more probable than its nonexistence. *A.B. v. Slippery Rock Area Sch. Dist.,* 906 A.2d 674 (Pa.Cmwlth.2006). It was also within the exclusive province of the Commission, as a fact-finder, to determine the credibility of the witnesses and to resolve any conflicting evidence. *A.G. Cullen Constr., Inc. v. State Sys. of Higher Educ.,* 898 A.2d 1145 (Pa.Cmwlth.2006). The evidence accepted by the Commission as credible amply supports its findings that Petitioners cheated on the examinations by possessing the answers to the compromised Test 1 version and using them during the test.

Barbour admitted to the investigators that he used the answers received from Hannigan and made the erase marks on the answer sheet. The Commission rejected Barbour's subsequent testimony that he did not make any erase marks on the answer sheet and that his police chief forced his admission to the investigators. Despite their denial of possessing the answers, Curran, Boyd, DiNardo, Ely, Fuller and Irey recorded the same answers on the Test 2 version of the Officer Safety Awareness test. They received a grade of 40% but would have received 90% on the compromised Test 1 version with the same wrong answer to Question #9. From such evidence, the Commission inferred that they possessed the answers to the Test 1 version before and during the test. In addition, DiNardo admitted that he copied Hannigan's answers before the test and looked over Hannigan's answer sheet during the test. Fuller admitted that he wrote down several answers heard in the classroom on his answer sheet.

Cuddhy admitted that he used the answers contained in Hannigan's text message, marked them on the answer sheet and later erased them. Cleghorn admitted that he received an e-mail containing the test answers from Freeman and compared them with his answers during the test. Collins and Cosentino sat next to each other during the test and had the same answers on the Test 2 version. They received 40% on the Test 2 version but would have received 100% on the Test 1 version. Heine also received 40% on the Test 2 version but would have received 100% on the Test 1 version. This evidence supported the Commission's inference that Collins, Cosentino and Heine possessed answers to the Test 1 version before or during the test and used them during the test.[9]

In conclusion, the Commission had the authority to revoke Petitioners' certifications for cheating, and the punishments imposed by the Commission are not unreasonable. Further, the revocations are supported by the evidence in the record. Ac-

---

9. Before the hearing officer, some Petitioners argued that the Commission failed to administer a polygraph test which they agreed to take. In Pennsylvania, the results of a polygraph test have no evidentiary value due to lack of its scientific reliability and are inadmissible for any purpose. *Commonwealth v. Brooks,* 454 Pa. 75, 309 A.2d 732 (1973); *Twp. of Silver Spring v. Thompson,* 90 Pa. Cmwlth. 456, 496 A.2d 72 (1985). The Commission's decision not to administer a polygraph test, therefore, is irrelevant in deciding whether the Commission's decisions are supported by substantial evidence.

cordingly, the Commission's final orders are affirmed.

## ORDER

AND NOW, this 5th day of July, 2012, the order of the Municipal Police Officers' Education and Training Commission in the above-captioned matter is AFFIRMED.